UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | | |
|---|---|---|
| DR. LARRY CUNNINGHAM, | ) | |
| | ) | |
| Plaintiff, | ) | Civil No. 3:20-cv-00008-GFVT-EBA |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| BLACKWELL, *et al.*, | ) | **&** |
| | ) | **ORDER** |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |

**\*\*\*   \*\*\*   \*\*\*   \*\*\***

This matter is before the Court upon cross-motions for summary judgment filed by Plaintiff
Dr. Larry Cunningham and Defendants University of Kentucky, Provost David W. Blackwell,
Dr. Larry Holloway, and General Counsel William E. Thro. [R. 63; R. 92.]  In January 2019, Dr.
Larry Cunningham, an employee of the University of Kentucky College of Dentistry, was
accused of health care fraud and forbidden from engaging in clinical activities.  [R. 63-4 at 21-
26.]  In response, Dr. Cunningham filed suit against multiple defendants including the University
of Kentucky, Provost David W. Blackwell, Dr. Larry Holloway, and General Counsel William
Thro.  [R. 1.]  In his Complaint, Dr. Cunningham alleges First Amendment retaliation, violations
of his procedural and substantive due process rights, breach of contract, violations of Kentucky
Wage and Hour law, violations of Kentucky's Whistleblower Act, and defamation, libel, and
slander.  *Id.*  Dr. Cunningham now moves for summary judgment against Provost Blackwell for
his procedural due process claim, against the University for his breach of contract claim, and

against the University and Provost Blackwell[1] for his wage and hour claim.  [R. 63-4.]  In response, the University, Provost Blackwell, Dr. Holloway, and General Counsel Thro move for summary judgment against Dr. Cunningham for all claims filed against them.  [R. 92.]

Further relevant to this matter is a companion case, *Shehata v. Blackwell*, *et al.*, 3:20-cv-00012-GFVT. In that matter, Dr. Ehab Shehata, a former colleague of Dr. Cunningham who was also accused of having committed health care fraud, brings similar claims. The Court notes this companion case because the matters are closely intertwined and require frequent reference to one another. Specific to this matter, however, the Court, having reviewed the record, and for the reasons set forth herein, will **GRANT IN PART** and **DENY IN PART** both Motions [R. 63; R. 92.]

## I

Dr. Larry Cunningham was employed at the University of Kentucky's College of Dentistry as medical doctor and licensed oral surgeon from 2001 to July, 2019.  [R. 63-4.]  In 2018, the UK Healthcare Corporate Compliance office began an investigation of Dr. Cunningham regarding a "documentation concern," which was later concluded without disciplinary action.  [R. 63-4 at 12.]  In January 2019, however, William Blackwell, the Provost of the University of Kentucky, informed Dr. Cunningham that he was being accused of fraud for "claiming credit for services which he did not perform."  *Id.* at 21.  Provost Blackwell indicated that he intended to pursue termination proceedings and, when Dr. Cunningham chose not to resign, forbade him from performing any clinical services.  *Id.*  As a result of this action, Dr. Cunningham was not allowed

---

[1] Although Dr. Cunningham additionally moves for summary judgment against Defendant Stephanos Kyrkanides for his Kentucky wage and hour law violations, the Court will analyze any claims against Defendant Kyrkanides by subsequent Order.  Accordingly, the analysis of this Order is limited to Dr. Cunningham's claims against the University of Kentucky, Provost Blackwell, Dr. Holloway, and General Counsel Thro.

to treat patients in the faculty clinic, perform surgery at UK Chandler Hospital, oversee residents' and interns' patient care, teach clinical courses, or work at the Veterans' Administration Hospital.  *See id.* at 23.  On May 24, Provost Blackwell issued a Statement of Charges against Dr. Cunningham, which initiated the termination process.  [R. 62-18 at 193; 63-4 at 26.]  Dr. Cunningham then resigned on June 7.  [R. 63-4 at 29.]  On January 1, 2020, Dr. Cunningham filed a Complaint alleging violations of his procedural and substantive due process rights, First Amendment retaliation, breach of contract, violations of Kentucky wage and hour law, violations of Kentucky's Whistleblower Act, and defamation.  [R. 1-2.]  The action was removed to federal court on January 27.  Now, cross-motions for summary judgment are pending and ripe for review.

## II

The Court first turns to Plaintiff Dr. Cunningham's Motion for Summary Judgment [R. 63-2.] In his Motion, Dr. Cunningham seeks summary judgment against Provost Blackwell for his procedural due process claim, against the University for his breach of contract claim, and against the University and Provost Blackwell in his individual capacity[2] for his wage and hour claim.[3] [R. 63-2; 63-4.]  Summary judgment is appropriate when the pleadings, discovery materials, and other documents in the record show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25 (1986).  "A genuine dispute exists on a material fact, and thus

---

[2] *See* [R. 94], dismissing all claims against all individual defendants in their individual capacities, and dismissing Plaintiff's wage and hour claim against Defendants Thro and Holloway in their individual capacities.

[3] Although the applicable defendants filed a short response to Dr. Cunningham's Motion [R. 74], their arguments are briefed more fully in their own Motion for Summary Judgment [R. 92]. Consequently, the Court will examine the overlapping claims briefed in each Motion in this portion of its Order and will then proceed to analyze the claims solely briefed by Defendants.

summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.'" *Olinger v. Corp. of the Pres. of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). The moving party has the initial burden of demonstrating the basis for its motion and identifying those parts of the record that establish the absence of a genuine issue of material fact. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex Corp.*, 477 U.S. at 325. Once the movant has satisfied this burden, the non-moving party must go beyond the pleadings and come forward with specific facts demonstrating there is a genuine issue in dispute. *Hall Holding*, 285 F.3d at 424 (citing *Celotex Corp.*, 477 U.S. at 324).

The Court must then determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Booker v. Brown & Williamson Tobacco Co*., 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson*, 477 U.S. at 251-52). In doing so, the Court must review the facts and draw all reasonable inferences in favor of the non-moving party. *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001). Summary judgment is inappropriate where there is a genuine conflict "in the evidence, with affirmative support on both sides, and where the question is which witness to believe." *Dawson v. Dorman*, 528 F. App'x 450, 452 (6th Cir. 2013).

## A

Dr. Cunningham first seeks summary judgment against Provost Blackwell regarding his procedural due process claim. [R. 63-4 at 30-35.] In his motion, Dr. Cunningham alleges that Provost Blackwell deprived him of his property interest in performing clinical duties without due process. *See id.* In opposition, Defendants seek summary judgment in their favor, arguing Dr.

4

Cunningham did not have a protected property interest in his clinical duties or his employment, and that regardless, Dr. Cunningham was afforded adequate process.[4]   [R. 92 at 24-32.]

The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that "No State shall deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.   The procedural component of the Due Process Clause protects rights created by state law and guarantees that no significant deprivation of life, liberty or property will take place until notice has been provided and the individual has a meaningful opportunity to be heard.  *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985).  In *Kentucky Department of Corrections v. Thompson*, 490 U.S. 454, 109 S. Ct. 1904, 104 L. Ed. 2d 506 (1989), the United States Supreme Court stated:

> We examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State, *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 571, 92 S. Ct. 2701, 2706, 33 L.Ed.2d 548 (1972); the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient, *Hewitt v. Helms*, 459 U.S. at 472, 103 S.Ct. at 871, 74 L. Ed. 2d 675.  The types of interests that constitute "liberty" and "property" for Fourteenth Amendment purposes are not unlimited; the interest must rise to more than "an abstract need or desire," *Board of Regents v. Roth*, 408 U.S. at 577, 92 S. Ct. at 2709, and must be based on more than "a unilateral hope," *Connecticut Board of Pardons v. Dumschat*, 452 U.S. 458, 465, 101 S.Ct. 2460, 2464, 69 L.Ed.2d 158 (1981).  Rather, an individual claiming a protected interest must have a legitimate claim of entitlement to it.

*Thompson*, 490 U.S. at 460.

---

[4] Defendants also argue that Dr. Cunningham's procedural due process rights were not violated by the University permitting a third-party to determine whether a physician should receive a portion of the income derived from treating a patient or whether the University itself should receive the full payment.  [R. 92 at 24-25.]  However, Dr. Cunningham clarifies in his Response that he has not made this claim, and instead, only claims that the stripping of his clinical duties, DSP income, clinical privileges, and employment occurred without due process.  [R. 95 at 19-20.]

Under step one, the Court must determine whether Dr. Cunningham held any property interests implicating procedural due process rights.[5]  [R. 63-4 at 30-32.]  First, the Court will determine whether Dr. Cunningham held a property interest in his clinical duties, privileges, and attendant Dental Services Plan (DSP) income.  Dr. Cunningham was a part of the College of Dentistry's DSP, which provided compensation in addition to his base salary for performing clinical services.  *Id.* at 1-2.  If a faculty member is listed as the Treating Provider for a clinical service, they receive forty to sixty percent of the payment collected for the service provided.  *Id.* at 4.  However, if the Treating Provider is a resident supervised by a faculty member, the College itself receives the payment in its entirety.[6]  *See id.* at 4.

Dr. Cunningham cites to Sixth Circuit and Supreme Court case law in support of his contention that he held a property interest in his ability to perform clinical services.  [R. 63-4 at

---

[5] Plaintiff based his procedural due process claim on the alleged deprivation of four distinct property interests: clinical activities in the faculty clinic, DSP income, clinical privileges as a staff member for UK Healthcare, and employment at the College of Dentistry.  [R. 1-2 at 36-37.]  However, in his motion, Dr. Cunningham only specifically addresses his interests in performing clinical activities and his employment.  [R. 63-4 at 30-33.]  Defendants address Dr. Cunningham's property interest in being designated as the treating provider for certain visits, being "reassigned to non-clinical duties," and his employment.  [R. 92 at 24-32.]  *See* FN 4, *supra*, addressing Defendants' argument that Dr. Cunningham had no property interest in being designated Treating Provider for the instances at issue.  Neither party specifically addressed Dr. Cunningham's procedural due process claims based on alleged property interests in his clinical privileges and DSP income.  While these are listed as separate property interests in his complaint, the Court will analyze these interests collectively with his interest in clinical duties.  The interest at issue is Dr. Cunningham's ability to perform clinical services, which was allegedly deprived without due process.  His ability to practice is established by his privileges to do so and being assigned clinical duties.  His income from the DSP program is earned by carrying out those assigned duties.  Therefore, though these interests were plead separately, they are inherently intertwined and will be addressed by this Court collectively.

[6] The basis of the accusation of fraud in this matter is that Dr. Cunningham altered various patient notes to make it appear that he was the Treating Provider and thus entitled to payment when, in fact, a resident was the Treating Provider.  Dr. Cunningham disputes this accusation and states that he was indeed the Treating Provider in the scenarios alleged to be fraudulent by the University.

30-32.]  In *Singfield v. Akron Metro. Hous. Auth.*, for example, the Sixth Circuit indicated that a

"property interest can be created by a state statute, a formal contract, or a contract implied from

the circumstances."  389 F.3d 555, 565 (6th Cir. 2004).  Moreover, in *Perry v. Sindermann*, the

Supreme Court ruled that "[a] person's interest in a benefit is a 'property' interest for due process

purposes if there are such rules or mutually explicit understandings that support his claim of

entitlement to the benefit."  408 U.S. 593, 601 (1972).  Under these theories, Dr. Cunningham

argues he and the University had a "mutually explicit understanding," based on the College's

Delineation of Privileges, that he held a property interest in his clinical practice.  [*See* R. 63-4 at

31.]

In opposition, Defendants argue that Dr. Cunningham did not hold a property interest in

performing clinical services.  Unlike Dr. Cunningham, who characterizes his alleged property

right as a form of economic interest implied by mutual understanding, Defendants characterize

his clinical assignments as simply job duties that the University was free to reassign without

providing due process.  [R. 92 at 28-29.]  In support, Defendants cite to *Crosby v. University of

Kentucky* and *Heavin v. Yates*.  *Id.*  In *Crosby*, the Sixth Circuit held that a faculty member's

appointment as a department chair was not a protected property interest.  863 F.3d 845, 552-53

(6th Cir. 2017).  The plaintiff in *Crosby* pointed to several regulations governing administrative

and faculty appointments as evidence that he and the University held a mutually explicit

understanding that a department chair held a property interest in his chairmanship.  The Sixth

Circuit rejected this argument, however, because the plaintiff could point to no regulation or

contract which guaranteed him due process prior to removal.  *See id.* at 554-55.  Similarly, in

*Heavin*, this Court found that, although the plaintiff had a protected property interest in her

employment, she had no protected interest in the specific duties her job permitted her to engage

in.  2021 U.S. Dist. LEXIS 19557 at *10-*11 (E.D. Ky. Feb. 2, 2021) ("No constitutional right to teach a specific class or at a specific university exists").  Using support from the holdings of these cases, Defendants assert that Dr. Cunningham's clinical assignments were job duties subject to the discretion of his employer and that he therefore held no property interest in his assignments.

The Court agrees with Dr. Cunningham.  Here, unlike in *Crosby*, Dr. Cunningham does point to a document which indicates the presence of a mutually explicit understanding: the College's Delineation of Privileges.[7]  In the Delineation, the College expressly indicates that when there is a "restriction to the clinical services and [sic] individual may perform," the right to an appeal and hearing process is triggered.  [R. 63-6 at 7.]  Defendants argue that this document only provided a process for the removal of clinical privileges, not duties.  This argument conflicts with the terms of the Delineation, which refers not to privileges but "clinical services" more generally.  This phrasing supports the Court's collective consideration of Dr. Cunningham's privileges, duties, and DSP income.  Consequently, unlike the documents in *Crosby*, the Delineation indicates that a faculty member is eligible to provide clinical services and that, before this eligibility is removed or altered, the member is guaranteed due process.  [*See id.*; R. 63-6 at 7.]  Moreover, unlike in *Heavin*, Dr. Cunningham's ability to perform clinical duties included an economic incentive, DSP income, which made up a portion of his income, not simply a duty or specific preference he held at his place of employment.  Accordingly, based on the mutual

---

[7] Dr. Cunningham points to additional policies he alleges contribute to this understanding in his Response to the Defendants' Motion for Summary Judgment.  [R. 95 at 11-14.]  However, he only provided links to access these policies rather than introducing them into the record.  Fed. R. Civ. P. 56(1) requires factual positions in a motion for summary judgment to be supported by a citation to "particular parts of materials in the record."  Therefore, the Court will not consider these policies and their effect on the parties' understanding.

understanding of Dr. Cunningham and the University, the Court finds that Dr. Cunningham held a property interest in his right to perform clinical services, which encompasses clinical duties, privileges, and DSP income.

This property interest was deprived when Dr. Cunningham was informed he could no longer perform clinical services.  [R. 63-4 at 21.]  On January 17, 2019, Provost Blackwell met with Dr. Cunningham and removed his ability to perform clinical services.  [R. 63-4 at 21; R. 92 at 15.] Despite the University's artful description of this removal as a "reassignment," it is evident that Dr. Cunningham was no longer permitted to perform clinical services after January 2019 and was therefore deprived of his property interest in his ability to do so.

Second, the Court must determine "whether the procedures attendant upon that deprivation were constitutionally sufficient." *Thompson*, 490 U.S. at 460 (citing *Hewitt v. Helms*, 459 U.S. at 472, 103 S.Ct. at 871, 74 L. Ed. 2d 675)).  "An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Loudermill*, 470 U.S. 532 at 542, 105 S. Ct. 1487, 84 L.Ed. 2d 494 (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S. Ct. 652, 94 L.Ed. 865 (1950)).  In the employment context, "the Supreme Court has explained that 'the root requirement of the Due Process [C]lause is 'that an individual be given the opportunity for a hearing *before* he is deprived of any significant property interest." *Mitchell v. Fankhauser*, 375 F.3d 477, 480 (6th Cir. 2004) (quoting *Loudermill*, 470 U.S. at 541).

However, due process rights are not without limits.  Federal courts are generally reticent to "interfere in the internal operations of the academy." *Parate v. Isibor*, 868 F.2d 821, 827 (6th Cir. 1989) (citing *Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S. Ct. 266, 21 L. Ed. 2d 228 (1968)).  Moreover, a university's failure to follow its own internal procedures does not give rise

to a constitutionally protected property interest.  *See Doe v. Miami Univ.*, 882 F.3d 579, 603 (6th Cir. 2018) (stating that "a mere failure by the University to follow its own internal guidelines does not give rise to a procedural-due-process violation"); *see also Doe v. Cummins*, 662 F. App'x 437, 445 n.2 (6th Cir. 2016) (noting that the Constitution and "not internal school rules or policies" mandate what due process is constitutionally required following an alleged deprivation of a property interest).

Dr. Cunningham argues that the process, or lack thereof, that he was provided prior to the removal of his ability to perform clinical services was constitutionally insufficient.  [R. 63-4 at 33-35.]  Dr. Cunningham alleges that he received no notice before the January, 2019 meeting in which he was informed he could no longer perform clinical services.  [R. 63-4 at 35.]  While Dr. Cunningham did meet with Compliance Officer Brett Short beforehand, these meetings were merely framed as "documentation concerns," so they could not have provided proper notice.  Dr. Cunningham argues neither these meetings, nor his meeting with Provost Blackwell in which he was informed of the allegations against him, served as a proper "hearing" because he was never provided an explanation of the University's evidence.  *Id.*; [R. 95 at 26-27 (citing *Lane v. City of Pickerington*, 588 F. App'x 456 (6th Cir. 2014) (finding that a pre-deprivation hearing must include an explanation of the employer's evidence).]  Accordingly, because "'the fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner,"'" Dr. Cunningham asserts that his procedural due process rights were violated.  [R. 63-4 at 34 (citing *Matthews v. Eldridge*, 424 U.S. 319, 333 (1976)).]  In response, Defendants assert that Dr. Cunningham was not entitled to the process outlined in the University's Delineation of Privileges because action was only taken on his clinical duties, not his privileges.  [R. 92 at 29-30.]

10

Ultimately, the Court declines to grant summary judgment for either party.  Although pre-deprivation hearings "need not be elaborate," the Sixth Circuit requires an "explanation of an employer's evidence" before a deprivation can occur.[8]  *Lane*, 588 Fed. App'x at 465.  At this point in the litigation, it is not clear whether Dr. Cunningham was provided a sufficient explanation of the evidence collected against him to deem the January meeting a "hearing." Further, the two meetings between Brett Short and Dr. Cunningham also could not have provided adequate process because these meetings had the primary purpose of informing Drs. Cunningham and Shehata of the documentation issue.  [R. 62-11 at 73, 94; R. 62-10 at 25-26.]  A pre-termination hearing requires notice, an explanation of the evidence, and an opportunity to respond.  *Mitchell v. Fankhauser*, 375 F.3d 477, 480 (6th Cir. 2004) (quoting *Loudermill*, 470 US at 546).  Dr. Cunningham was unaware of any intent to deprive him of his property rights when these meetings occurred.  [R. 62-11 at 94.]  Without notice of the charges against him, the meetings with Brett Short could not constitute a "hearing."  Accordingly, because there exists a genuine issue of material fact as to whether Dr. Cunningham was provided a sufficient explanation of the evidence collected against him during his January 2019 meeting with Provost Blackwell, summary judgment is inappropriate.

Alongside his clinical practice, Dr. Cunningham argues that he held a property interest in his employment.  It is well settled that "[s]tate employees who have a property interest in their employment are entitled to certain minimum process before being fired."  *Cox v. Shelby State Community College*, 48 F. App'x 500, 507 (6th Cir. 2012) (citing *Cleveland Bd. Of Educ. v.*

---

[8] Though the Sixth Circuit in *Lane* requires an explanation of evidence prior to termination of employment, the rationale of the *Lane* Court indicates that, for a hearing to be constitutionally sufficient, one must be provided an explanation of the evidence brought against them to support the deprivation of a property interest.

*Loudermill*, 470 U.S. 532, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985)).  The Supreme Court has

held that "college professors and staff members dismissed during the terms of their contracts

have interests in continued employment that are safeguarded by due process." *Bd. Of Regents of*

*State Colleges v. Roth*, 408 U.S. 564, 576-77, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972)

(citing *Wieman v. Updegraff*, 344 U.S. 183, 73 S. Ct. 215, 97 L. Ed. 216 (1952)).

    Dr. Cunningham argues that by revoking his ability to perform clinical services, he was

constructively discharged and "left with . . . a job in name only."  [R. 63-4 at 32-33.]  He alleges

this was a deprivation of his property interest in his employment with the College without pre-

deprivation due process.  *Id.*  Defendants do not argue that Cunningham has no property interest

in his employment; rather, they claim he could not have been deprived of that interest because he

resigned.  [R. 92 at 31-32.]  Defendants mischaracterize Cunningham's claim. He does not claim,

as they allege, that the June, 2019 *initiation* of termination proceedings constituted the

constructive discharge.  [*See* R. 92 at 31-32.]  Instead, he claims that the "reassignment" of

clinical duties in January, 2019 amounts to a constructive discharge.  [R. 63-4 at 32-33.]

    Constructive discharge can constitute a deprivation of a property interest subject to

procedural due process protection.  *Nunn v. Lynch*, 113 F. App'x 55, 59 (6th Cir. 2004) (citing

*Parker v. Bd. Of Regents of Tulsa Jr. Coll.*, 981 F.2d 1159, 1162 (10th Cir. 1992)).  An

employer's adverse employment action creates a constructive discharge if it makes working

conditions "so unpleasant and unreasonable that a reasonable person in the employee's shows

would have felt compelled to resign." *Ford v. General Motors Corp.*, 305 F.3d 545, 554 (6th

Cir. 2002) (quoting *Yates v. Avco Corp.,* 819 F.2d 630, 636–37 (6th Cir.1987)).  To resolve this

issue, the Court engages in a two-part inquiry encompassing an employee's objective feelings

and the employer's intent. *Id.* (citing *Yates*, 819 F.2d at 636-37).  "Plaintiff must show that the

employer intended and could reasonably have foreseen the impact of its conduct on the employee." *Id.*

Accordingly, the Court declines to grant summary judgment to either party. The issue is whether losing his ability to perform clinical activities made Dr. Cunningham's position with the College "so unpleasant and unreasonable that a reasonable person" would have resigned. *Ford*, 305 F.3d at 554. There is a genuine issue of material fact as to whether a reasonable person in Dr. Cunningham's position would have resigned. On one hand, loss of clinical practice and clinical teaching does seem to affect a significant portion of Dr. Cunningham's responsibilities as a member of the College of Dentistry. However, Dr. Cunningham himself stated he "still attended leadership meetings and worked on schedules and academics," and that after the "reassignment" his job consisted of "primarily administrative [sic] of the residency program, counseling residents, and trying to fulfill leadership responsibilities." [R. 62-11 at 235.] Further, Dr. Cunningham still received his base salary between the "reassignment" of his clinical duties and his resignation, though he did lose an unknown amount of clinical income he would have received through the DSP. *Id.* Therefore, there is a material issue of genuine fact as to whether Dr. Cunningham was constructively discharged when his clinical activities were "reassigned," depriving him of his property interest in his employment. Accordingly, the Court denies summary judgment to both parties on Dr. Cunningham's procedural due process claim based on his employment.

Dr. Cunningham also suggests a procedural due process claim under a "stigma plus" theory in his Response to the Defendants' Motion for Summary Judgment but does not elucidate any of the five factors necessary to succeed on such a claim. [R. 97 at 4.] This attempt fails to identify anything in the record that would establish there is no genuine issue of material fact on such a

13

claim.  *See Hall Holding*, 285 F.3d at 424.  Even if this claim were properly pled, it would fail on

the merits because a plaintiff is required to affirmatively request a name-clearing hearing to be

able to raise a stigma-plus claim.  *Brown v. City of Niota, Tennessee*, 214 F.3d 718, 723 (6th Cir.

2000).  Nothing in the record suggests that Dr. Cunningham requested a name-clearing hearing at

any point.  Therefore, Defendants are entitled to summary judgment in their favor on any

procedural due process claim based on a "stigma plus" theory.

## B

Next, the Court turns to Dr. Cunningham's breach of contract claim against the University.

In his Motion, Dr. Cunningham alleges that the University breached his written contract in two

ways: by denying him Plan income for patient care services performed and by forbidding him

from performing clinical activities.[9]  [R. 63-4 at 35-39.]  In response, the University argues that

no breach occurred.  [R. 92 at 34-39.]  In Kentucky, a plaintiff must demonstrate three things to

establish a breach of contract claim: 1) the existence of a contract; (2) breach of that contract;

and 3) damages flowing from a breach of that contract.  *Delmar v. Morgan*, 2015 U.S. Dist.

LEXIS 4880 at *5 (W.D. Ky. Jan 15, 2015) (citing *Metro Louisville/Jefferson County*

*Government v. Abma*, 326 S.W.3d 1, 8 (Ky. Ct. App. 2009) (citation omitted); *see also Fifth*

*Third Bank v. Lincoln Financial Securities Corp.*, 453 F. App'x 589, 601 (6th Cir. 2011).

Although the state is generally shielded from liability under the doctrine of sovereign immunity,

---

[9] In his Complaint, Dr. Cunningham also raises denial of his "membership in the Dental Services Plan" as a breach of his employment contract.  [R. 1-2 at 41.]  While this ground is not addressed specifically by either party's Motion, the Court understands this to be the same as his claim of breach for denial of clinical activities.  By stripping his clinical activities, the University took Dr. Cunningham out of the DSP, which would have given him a portion of the income from the clinical services he would have provided.  Therefore, the Court will address Dr. Cunningham's DSP Membership claim alongside his claim of breach for denial of clinical activities.

KRS 45A.245 provides a limited waiver of immunity for contract claims brought against the Commonwealth derived from a written contract.  Ky. Rev. Stat. Ann. 45A.245.

Dr. Cunningham first alleges that the University committed breach for denying him income for patient care services he performed.  Dr. Cunningham's 2001 employment offer letter states "you will receive a distribution from the Dental Services Plan at a rate of 40% of collections." [R. 1-4.]  Dr. Cunningham also points to his 2012 Notice of Academic Appointment and Assignment, which specifically states that by accepting his appointment as a tenured professor, he accepted the provisions of the "Dentists' Services Plan."  [R. 63-5.]  Dr. Cunningham alleges that, through discovery, there were eighty-nine instances in which a patient was appointed to him but a resident was identified as the treating provider.  [R. 63-4 at 37.]  Because the collection for those eighty-nine instances totaled $4,333.99, Dr. Cunningham argues he is owed $1,733.60, with pre-judgment interest.  *Id.* at 37-38 (citing *Univ. of Louisville v. RAM Engineering & Construction, Inc.*, 199 S.W.3d 746 (Ky. Ct. App. 2005).  In further support, Dr. Cunningham argues that *Britt v. Univ. of Louisville*, 2021 Ky. LEXIS 118 (Ky. March 25, 2021) controls.  In *Britt*, the Kentucky Supreme Court ruled that the University of Louisville incorporated by reference into an employment contract the provisions of its administrative regulations, called The Redbook, by including language that indicated that employment at the University was "subject to" and "govern[ed]" by The Redbook.  *Id.* at *14-*15.  Under *Britt*, Dr. Cunningham states that his initial offer letter, continuous appointment, the DSP, Governing Regulations, and Administrative Regulations collectively constitute his employment agreement.  [R. 63-4 at 37.]

In their Motion, Defendants argue that Dr. Cunningham's contract does not allow him the ability to designate whether he "treated" a patient for payment purposes and, instead, the designation process was properly handled by a third party.  [R. 92 at 35.]  Defendants argue that

15

no provision Dr. Cunningham points to entitles him to a "right to self-determine" who would be designated Treating Provider. [10]  [R. 92 at 35-37.]  Finally, Defendants argue that the statute of limitations has run on Dr. Cunningham's breach claim.  [R. 74.]  Under KRS 45A.260, any contract claim against the Commonwealth "shall be commenced […] within one (1) year from the date of completion specified in the contract."  Ky. Rev. Stat. Ann. 45A.260.  Because the last instance identified by Dr. Cunningham in which he alleges he was not paid for his services was on July 20, 2018, Defendants argue his complaint filed on January 1, 2020 is untimely.  [R. 74 at 3.]

Dr. Cunningham responds that he is not seeking the Court to interpret his employment contract to permit him to determine whether he "treated" his patients or whether a third-party could rightfully do so.  [*See* R. 95 at 32-33.]  Instead, Dr. Cunningham indicates that he only seeks payment for services he performed and was promised payment.  *Id.* at 33.  Regarding Defendants' statute of limitations argument, Dr. Cunningham argues that the statute of limitations did not begin to run until the services were billed, not performed, and that billing often occurs months after services are performed by providers.  [R. 80 at 2 ("[i]t is the date that DSP *should have been paid* after the payments were collected that is the relevant date.").]

---

[10] Specifically, Defendants state that a 2013 Guidance Document, which Dr. Cunningham does not explicitly mention but has referenced throughout this litigation, is not incorporated by reference.  [R. 92 at 36-37.]  The 2013 Guidance Document, which allegedly interpreted provisions of the Plan, indicated that, when a treating provider and a resident both oversee the treatment of a patient, the treating provider is to receive credit for the services and will thereby be eligible for forty percent of the collection.  [*See* 62-7 at 179-180.]  This policy was later altered to indicate that when both a treating provider and resident oversee the treatment of a patient, the College receives the full collection.  [R. 63-8.]  Dr. Cunningham alleges that the 2017 update is not binding because it was not legislated through proper channels of internal administrative procedure.  [*See* R. 63-4 at 6-7.]

16

Ultimately, the Court concludes that the statute of limitations has likely expired for Dr. Cunningham's breach of contract claim for services provided.  Although Dr. Cunningham argues that the statute of limitations does not run until payment for services has been billed, he provides no case law in support of his position and cites no discovery regarding the dates that services were billed from the University.  Instead, Dr. Cunningham states that he does not have specific information but "it is believed" that the billing time would have fallen within the one-year period of the statute of limitations.  [R. 80 at 2.]  Accordingly, there does not exist a genuine issue of material fact as to whether the statute of limitations has run because Dr. Cunningham provides no evidence, aside from his own belief, to the contrary.  *Keeneland Ass'n v. Eamer*, 830 F. Supp. 974, 984 (E.D. Ky. 1993) ("*Celotex* affirms that 'nonmoving parties must fulfill their burden of production' once the moving party has met its burden of production.' […] Once the moving party has met its burden of production, 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'") (quoting first *Celotex Corp v. Catrett*, 477 U.S. 317, 324 (1986) and then *Matsushita Elec. Indus. Co. v. Zenit Radio Corp.*, 475 U.S. 574, 586 (1986)).   As such, the Court will dismiss Dr. Cunningham's claim for breach of contract for services provided as untimely.

Next, Dr. Cunningham alleges that the University breached his contract by forbidding him from engaging in clinical practice, which denied him membership in the DSP.  In support, Dr. Cunningham cites to the University's Governing Regulation X.  [R. 63-4 at 38-39.]  Regulation X limits the University's ability to suspend or assign a faculty member to other duties in lieu of suspension, "only if immediate harm to the faculty member or others is threatened by the faculty member's continuance…"  *Id.* at 42.  Because Dr. Cunningham argues that there existed no immediate threat of harm if he had remained able to perform his clinical duties, he alleges that

17

the University breached its contract.  *See id.*  In response, Defendants argue that the Kentucky

Supreme Court's holding in *Britt* is not controlling in this matter because Dr. Cunningham's

employment contract does not indicate a mutual understanding that the University's

administrative regulations were incorporated into the contract by reference.  [*See* R. 92 at 38-39.]

Defendants argue that, unlike in *Britt*, where language existed in the contract which indicated

that the University of Louisville's regulations "govern[ed]" the employment contract, Dr.

Cunningham's offer letter does not mention the Governing Regulations, Administrative

Regulations, Medical Staff Bylaws, or Senate Bylaws.  *See id.* (discussing *Britt v. Univ. of

Louisville,* 2021 Ky. LEXIS 118 at *5).

   Upon review, the Court declines to grant summary judgment for either party.  The *Britt* court

indicated that the University of Louisville's administrative regulations were incorporated by

reference because of the specific language found in that contract.  *See Britt v. Univ. of Louisville,*

2021 Ky. LEXIS 118 at *5.  Dr. Cunningham only points to his employment contract[11] [R. 1-4]

and Notice of Academic Appointment and Assignment [R. 92-34] to support his contention that

various policies were incorporated into his employment contract.  [R. 63-4 at 36-37.]  The

University's regulations are not mentioned in Dr. Cunningham's employment offer letter [R. 1-4]

and are only mentioned regarding a tenure track professor's probationary period in the Notice [R.

92-34].  As a result, the University's regulations are not incorporated by reference into Dr.

Cunningham's contract.  The University, however, cannot have its cake and eat it too.  Because

---

[11] Neither party addresses whether the employment offer letter is or is not a contract.  In *Univ. of
Louisville v. Bohm*, the Kentucky Court of Appeals held that an employment offer letter sent by a
University to a prospective employee, titled a "formal offer of employment," which was then
signed by the employee, constituted an employment contract.  2019 WL 1422912 at *4 (Ky. Ct.
App. Mar. 29, 2019).  This Court agrees and finds that the offer letter sent to Dr. Cunningham,
referenced as an "offer," explicitly "accepted" by Dr. Cunningham's signature, was an
employment contract between him and the University.  [R. 1-4.]

its regulations are not incorporated by reference, the words on the face of the employment contract control.  Dr. Cunningham's employment contract states that he "will receive a distribution from the Dental Services Plan at a rate of 40% of collections."[12]  [R. 1-4.]   Although the administrative regulations describe when eligibility can be removed, the University argues that the regulations are not incorporated into its contract with Dr. Cunningham.  The words on the face of the contract state that Dr. Cunningham would "receive a distribution" from the DSP. *Id.*  There is a genuine issue of material fact as to what exactly this term entails.  Specifically, it is not clear whether this term entitled Dr. Cunningham to unrestricted participation in the DSP, or whether the University could alter his participation at will.  Therefore, there is a genuine issue of material fact on the terms of the employment contract, and the Court declines to grant summary judgment to either party.

## C

The Court will next analyze Dr. Cunningham's wage and hour claims against the University and Provost Blackwell[13] under KRS 337.060.  KRS § 337.060 states that "[n]o employer shall withhold from any employee any part of the wage agreed upon," unless a statutory exception applies.  Ky. Rev. Stat. Ann. 337.060.  Governmental immunity is waived for claims brought pursuant to KRS Chapter 337.  *Lipson v. Univ. of Louisville*, 556 S.W.3d 18, 29 (Ky. Ct. App. 2018).  As he alleged with his breach of contract claim, Dr. Cunningham first argues that the

---

[12] Compare to companion case, *Shehata v. Blackwell, et al.*, 3:20-cv-00012-GFVT, granting summary judgment for Dr. Shehata's similar claim against the University.  Dr. Shehata's employment offer letter stated he was "eligible to participate in the College's Dental Services Plan," which the Court held entitled Dr. Shehata to a contractual right to participate in the DSP. Dr. Cunningham's term is less definitive, so a jury should resolve the meaning of the term and whether it was breached.

[13] Defendants Holloway and Thro were dismissed from this claim on agreement between the parties [R. 94] and Dr. Cunningham's wage and hour claims against Defendant Kyrkanides will be addressed in a separate order.

University owes him $1,733.60 plus pre-judgment interest for instances of unpaid labor which he and the University had agreed that he would be paid for.  [*See* R. 63-4 at 39-40.]  In response, Defendants argue that summary judgment in favor of Dr. Cunningham is inappropriate because there exists a bona fide dispute as to whether he was owed the wages he claims.  [R. 92 at 40-41.]  In support, Defendants cite to *Kimmel v. Progress Paint Mfg. Co.*, 2003 Ky. App. Unpub. LEXIS 1, *9 (Ky. Ct. App. January 10, 2003).  In *Kimmel*, the Kentucky Court of Appeals analyzed KRS 337.060 and found that, by including the requirement that wages must be "agreed upon," the Kentucky legislature did not intend the statute "to apply where there exists a bona fide dispute concerning wages."  2003 Ky. App. Unpub. LEXIS at *9.  Defendants argue that Dr. Cunningham's disagreement with the University's decision to designate a resident as the Treating Provider creates a bona fide dispute which precludes a wage and hour claim.  [R. 92 at 41.]  Moreover, though Dr. Cunningham did not brief this argument, Defendants argue that Dr. Cunningham cannot claim that the University and Provost Blackwell withheld his wages by forbidding him to perform clinical duties because he never "earned" any additional income he may have received upon performance.  *Id.* at 41-42.

The Court declines to grant summary judgment for either party because there exists a genuine issue of material fact as to whether the wages sought by Dr. Cunningham were "agreed upon." The Court notes, however, that simply because a genuine issue of material fact exists at summary judgment does not necessarily mean a bona fide dispute is present to warrant summary judgment for the Defendants.  Here, it remains unclear whether Dr. Cunningham "treated" each patient in the instances he cites or whether a third party was properly permitted to determine who "treated"

patients.[14]  Because these questions could be answered at trial, however, the Court cannot

confidently conclude that a bona fide dispute is present at summary judgment as to render KRS

337.060 non-binding.  The Court does grant summary judgment in favor of Defendants as to any

argument that Dr. Cunningham is owed wages for work he did not perform, and, accordingly,

will dismiss Provost Blackwell from Plaintiff's wage and hour claim.[15]

## D

Now, the Court turns to the claims remaining in Defendants' Motion for Summary Judgment

[R. 92] that were not briefed in Dr. Cunningham's Motion [R. 63-4.]  Defendants seek summary

judgment against Dr. Cunningham's First Amendment retaliation claim against Defendants Thro,

Holloway, and Blackwell.  To establish a claim of First Amendment retaliation, a plaintiff must

prove "(1) he engaged in protected conduct, (2) the defendant took an adverse action that is

capable of deterring a person of 'ordinary firmness from continuing to engage in that conduct,'

and (3) 'the adverse action was motivated at least in part by the [plaintiff's] protected

---

[14] This requires a determination of whether the 2013 Guidance Document was binding on the College, whether the parties agreed to follow the 2013 Document, and whether the Guidance Document was properly updated by administrative procedure in 2017 as to alter the agreement. If the agreement between the parties indicated that internal procedure would be followed and the Guidance Document was correctly updated by internal procedure, Dr. Cunningham is likely owed no wages under KRS 337.060.  Conversely, if the agreement between the parties did not indicate that internal procedure would be followed or if the Guidance Document was not updated properly, it is likely that Dr. Cunningham is owed wages. The University, however, cannot relieve itself of its duty to pay agreed upon wages by simply arguing that its own, possibly faulty, update of internal procedure creates a "bona fide dispute" as to render KRS 337.060 non-binding.

[15] This includes any potential wages that Dr. Cunningham might have earned had his clinical privileges not been withheld from him because KRS 337.060's protection does not extend further than wages "agreed upon." Provost Blackwell is dismissed because there is no evidence that he was involved in withholding any wages "agreed upon" from Dr. Cunningham.  Instead, Dr. Cunningham's complaint makes clear that he sued Provost Blackwell for his alleged involvement in preventing Dr. Cunningham from performing his clinical duties and thereby receiving additional employment income through the College's DSP.  [*See* R. 1-2 at 43-46.]

conduct.'" *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010) (citing *Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999) (en banc)).  Additionally, if the plaintiff is a public employee, the Sixth Circuit mandates the application of a two-step analysis to determine whether the action taken against him violates the First Amendment.  "First, we must determine whether the employee was speaking as a government employee (rather than in his capacity as a private citizen) and whether the statement constitutes speech on a matter of public concern.  If so, we then apply a balancing test to determine whether the interest in protecting speech on issues of public concern outweighs the interest of the government employer 'in promoting the efficiency of the public services it performs through its employees.'" *Ryan v. Blackwell*, 979 F.3d 519, 526 (6th Cir. 2020) (citations omitted).  These two steps are required sub-elements of the first element of the First Amendment retaliation framework.  *Id.*  If that showing is made, the burden shifts to the defendant to show that the same action would have been taken absent plaintiff's exercise of protected conduct.  *Id.*

   Dr. Cunningham raises a First Amendment Retaliation claim based on his allegation that he suffered adverse employment action because of his participation in a separate First Amendment Retaliation case filed against the University by Dr. Mullins.  [R. 1-2 at 33-36.]  Specifically, he alleges adverse employment actions of (1) denial of DSP income, (2) denial of clinical activities, (3) accusations of fraud, (4) ostracization, (5) a hostile work environment, and (6) initiation of termination proceedings.  *Id.* at 35.  Defendants argue that the decision to designate a resident rather than the treating faculty member as the Treating Provider was not an adverse employment action because it had a *de minimis* impact on Dr. Cunningham's DSP income.  [R. 92 at 20.] They also argue there is no causal connection between Dr. Cunningham's participation in the *Mullins* lawsuit and the Treating Provider designation because Defendants Thro, Holloway, and

22

Blackwell were not involved in that determination. *Id.* at 20-21. Defendants also argue that Dr. Cunningham cannot prove a causal connection between his deposition in *Mullins* and the reassignment of his duties or initiation of termination proceedings. *Id.* at 21. Further, they state that even if Dr. Cunningham could show a causal connection, Defendant Blackwell would have initiated termination proceedings regardless of the *Mullins* deposition because of Dr. Cunningham's "misuse [of] University funds." [R. 92 at 22.]

Because Dr. Cunningham was a public employee, the Court applies the two-step test to determine whether his *Mullins* deposition was protected speech. *Blackwell*, 979 F.3d at 526 (citations omitted). Neither party presented an argument on this issue, but the Court finds that Dr. Cunningham's deposition and planned trial testimony in a First Amendment retaliation case is protected conduct. The first prong of the two-part analysis asks first whether the employee was speaking as a government employee or as a private citizen. *Id.* Courts look to the motivation, setting, and audience of the speech to determine whether it was as a citizen or as a government employee. *DeCrane v. Eckert*, 12 F.4th 586, 596 (6th Cir. 2021). Dr. Cunningham was not motivated to fulfill any job duty when he chose to speak in the *Mullins* suit. *See id.* In fact, he was speaking *against* the University and in support of Mullins, its opposing party. [*See* R. 1-2 at 34.] Further, the setting of the speech was not "on-the-clock speech at the employer's place of business." *DeCrane*, 12 F.4th at 596. Finally, the audience of the speech was primarily "outside individuals," including opposing counsel and the court. *Id.* Though Dr. Cunningham's supervisors were likely part of the speech's audience, their presence was in their capacity as Defendants, not as Dr. Cunningham's supervisors. This is distinct from the situation in which speech is directed to a public employee's supervisors for the purpose of complaining to supervisors about work conditions. *See id.* Collectively, these inquiries show that when he

23

participated in a deposition in a case against the University, Dr. Cunningham was speaking as a citizen and not a public employee.

The second element of this initial inquiry asks whether the speech was on a matter of public concern.  Speech is a matter of public concern if it "'involves issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government.'"  *Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 898 (6th Cir. 2001) (quoting *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983)).  The Ninth Circuit ruled in *Karl v. City of Mountlake Terrace* that a public employee's deposition in a First Amendment retaliation case was a matter of public concern because it involved the violation of constitutional rights, and further opined that it was "not a close case."  678 F.3d 1062, 1069 (9th Cir. 2012) (citations omitted).  The case at hand is directly analogous.  Dr. Cunningham's deposition and planned trial testimony in the *Mullins* lawsuit concerned Mullins's claim that the University was liable for First Amendment retaliation.  [R. 95 at 3.]  By testifying, Dr. Cunningham "enable[ed] members of society to make informed decisions about the operation of their government," here, the University of Kentucky.  *Brandenberg*, 253 F.3d at 898.  Therefore, Dr. Cunningham's testimony in the *Mullins* suit was a matter of public concern.

Sub-element two requires the Court to undergo a balancing test to determine whether Dr. Cunningham's "free speech interests outweigh the efficiency interests of the government as employer."  *Bennett*, 977 F.3d at 539 (citing *Gillis v. Miller*, 845 F.3d 677, 684 (6th Cir. 2017)).  The Sixth Circuit explains that the "pertinent considerations" for the balancing test are:

> [w]hether the statement [(a)] impairs discipline by superiors or harmony among co-workers, [(b)] has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, [(c)] impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise, or (d) undermines the mission of the employer.  The consideration of the employee's performance, impaired discipline by superiors, harmony among

24

> co-workers, and undermining of the office's mission is "focuse[d] on the effective functioning of the public employer's enterprise."

*Bennett*, 977 F.3d at 539-540 (citations omitted).  Upon review of the pertinent considerations, the Court concludes that Dr. Cunningham's free speech interest outweighs the efficiency interest of the University.  The first two factors do weigh in favor of the University.  The tension between Dr. Cunningham and Dean Kyrkanides is evidence that the *Mullins* deposition caused disharmony amongst co-workers and had a detrimental impact on their working relationship. [*See* R. 63-13, 63-14, 63-15.]  However, there is also no evidence to show that testifying about the University's alleged constitutional violations impeded Dr. Cunningham's duties to teach, perform clinical activities, et cetera.  Finally, Dr. Cunningham's testifying to alleged constitutional violations could not undermine the University's mission because that mission cannot include unlawful operations.

In *Bennett*, the Sixth Circuit predicated its balancing test analysis by emphasizing the special importance of government employee speech on issues of government operations.  977 F.3d at 538-39 ("The Supreme Court described the 'employee-speech jurisprudence' as 'acknowledg[ing] the importance of promoting the public's interest in receiving the well-informed views of government employees engaging in civic discussion.'" (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 419, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006)); "Central to the concept of protecting the speech of government employees is the idea that public employees are the most likely to be informed of the operations of public employers and that the operation of such entities is 'of substantial concern to the public.'" (quoting *See v. City of Elyria*, 502 F.3d 484, 492 (6th Cir. 2007)); "'Public interest is near its zenith when ensuring that public organizations are being operated in accordance with the law.'" (quoting *Marohnic v. Walker*, 800 F.2d 613, 616 (6th Cir. 1986))).  Testifying to alleged constitutional violations by a state university is exactly the type of

speech these cases place a strong emphasis on protecting.  Therefore, these considerations, in addition to the Court's conclusion that two of the four balancing test factors weigh in favor of Dr. Cunningham, show that his free speech interest outweighs the University's interest in efficient operation.

Having determined that Dr. Cunningham spoke on a matter of public concern, the Court must next determine whether the University "'took an adverse action that is capable of deterring a person of 'ordinary firmness from continuing to engage in that conduct,' and whether 'the adverse action was motivated at least in part by the [plaintiff's] protected conduct.'"  *Hill*, 630 F.3d at 472.  If these conditions are satisfied, the University must show that it would have engaged in the same action regardless of Dr. Cunningham's engagement in protected conduct. *Blackwell*, 979 F.3d at 526.

Defendants argue that the decision to designate the resident, rather than the faculty member, as the Treating Provider was at most *de minimis*, which cannot constitute an adverse action.  [R. 92 at 20.]  They then argue that Dr. Cunningham cannot show a sufficient causal connection between his *Mullins* deposition and either the Treating Provider designation or the initiation of termination proceedings against him.  *Id.* at 20-22.  Dr. Cunningham's response focuses largely on the actions of Defendant Kyrkanides, which will be addressed in a separate order.  Dr. Cunningham also argues that the Treating Provider designation was not *de minimis* because that decision had more than merely financial impacts.

Dr. Cunningham likely did face at least some adverse employment action.  First, the treating provider designation did directly result in lost wages for Dr. Cunningham, and the Sixth Circuit has held that decreased pay is an adverse employment action.  *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 303 (6th Cir. 2012) (citing *Clay v. United Parcel Serv., Inc.*, 501 F.3d

695, 710–11 n. 6 (6th Cir.2007)).  However, the Court agrees that Dr. Cunningham's loss of DSP income because of the change in policies was *de minimis* because he lost approximately 0.5% of that income.  [R. 92 at 20; R. 92-26.]  On the other hand, termination is considered an adverse employment action.  *Kubala v. Smith*, 984 F.3d 1132, 1140 (6th Cir. 2001) (citing *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990)).  Though *threats* of discharge are not adverse employment actions, *Plautz v. Potter*, 156 F.App'x 812, 817 (6th Cir. 2005), the actual initiation of termination proceedings is more analogous to discharge itself than a threat of discharge because the process of termination has actually begun.  A reasonable person facing these actions could have been deterred from the conduct allegedly being retaliated for *if* the action was connected to the protected conduct.  However, causation is where Dr. Cunningham's claim fails.

The Court agrees with the Defendants that there is insufficient evidence to show a causal connection between any actions of these Defendants regarding the treating provider designation (resulting in lost DSP income), denial of clinical activities, or initiation of termination proceedings and Dr. Cunningham's *Mullins* deposition. [16]   Dr. Cunningham's support for this causal connection consists of statements by Dr. Kyrkanides [*see* R. 95 at 15-18], whose claims are not being addressed in this order.  Dr. Cunningham has not pointed to any evidence that Defendants Blackwell, Holloway, or Thro were influenced by Dr. Kyrkanides's statements.  In fact, in Dr. Cunningham's own Response, he cites Defendant Blackwell's testimony that he did

---

[16] Neither party moved for summary judgment on Dr. Cunningham's claims for First Amendment retaliation based on accusations of fraud, ostracization, or a hostile work environment.  However, for these same reasons, there is no evidence of a causal connection between the *Mullins* testimony and any of these other alleged acts of reprisal.  Therefore, the Court will grant summary judgment to the Defendants for the entire First Amendment retaliation claim.

not give Dr. Kyrkanides's statement "a shred of credibility." [R. 62-1 at 166]. Further, Provost Blackwell stated that he was "doubting Kyrkanides's credibility . . . when he was making these wild allegations." *Id.* at 146. Mr. Thro also testified that he did not rely on Dr. Kyrkanides's statements. [R. 62-18 at 90.] Therefore, there is an absence of evidence to show that any allegedly retaliatory acts were in response to Dr. Cunningham's participation in the *Mullins* suit.

Even if there were evidence of a causal connection, the burden would then shift to the Defendants to show that they would have taken the same action regardless of whether the plaintiff engaged in the protected conduct. *Thaddeus-X*, 175 F.3d at 399. The Defendants would have changed the Treating Provider designation policy regardless of Dr. Cunningham's deposition, plainly evidenced by the fact that the policy was instituted in 2017, while Dr. Cunningham's deposition occurred in May of 2018. [R. 92 at 21.] There are no facts connecting the policy to Dr. Cunningham's deposition. The reassignment of clinical duties and the initiation of termination proceedings also would have occurred regardless of Dr. Cunningham's deposition. These actions were taken because of the University's finding of alleged misconduct by Dr. Cunningham. Defendants point out another circumstance where a faculty member faced discipline for misuse of university funds, which is how they characterized Dr. Cunningham's practice of re-writing notes. [R. 92 at 22 (citing *Blackwell*, 979 F.3d at 523).] Therefore, Dr. Cunningham would have been disciplined regardless of his *Mullins* testimony. Accordingly, the Court grants summary judgment for the Defendants on Dr. Cunningham's First Amendment retaliation claim.

**E**

Defendants also seek summary judgment on Dr. Cunningham's claim under KRS Chapter

61,[17] Kentucky's Whistleblower Act.  [R. 92 at 23-24.]  KRS Chapter 61 provides:

> No employer shall subject to reprisal ... any employee who in good faith reports, discloses, [or] divulges ... any facts or information relative to an actual or suspected violation of any law, statute, executive order, administrative regulation, mandate, rule, or ordinance of the United States, the Commonwealth of Kentucky, or any of its political subdivisions, or any facts or information relative to actual or suspected mismanagement, waste, fraud, abuse of authority, or a substantial and specific danger to public health or safety.

Ky. Rev. St. § 61.101.  The Act "serves the public purpose of identifying governmental

wrongdoing."  *Northern Ky. Area Dev. Dist. v. Wilson*, 612 S.W.3d 916, 920 (Ky. 2020)

(quoting *Harper v. Univ. of Louisville*, 559 S.W.3d 796, 801 (Ky. 2018)). A claim under the Act

must satisfy four elements:

> (1) the employer is an officer of the state; (2) the employee is employed by the state; (3) the employee made or attempted to make a good faith report or disclosure of a suspected violation of state or local law to an appropriate body or authority; and (4) the employer took action or threatened to take action to discourage the employee from making such a disclosure or to punish the employee for making such a disclosure.

*Thornton v. Office of Fayette Co. Att'y*, 292 S.W.3d 324, 329 (Ky. Ct. App. 2009) (quoting

*Davidson v. Com., Dept. of Military Affairs*, 152 S.W.3d 247, 251 (Ky. Ct. App.2004)).  The

University of Kentucky is clearly an "officer" of the state of Kentucky, and Dr. Cunningham was

consequently employed by the state.  *See Judd v. Univ. of Kentucky*, 2019 WL 3851631 (Ky. Ct.

App. Aug. 16, 2019) (applying the Act to an Assistant Dean at the University).  Defendants do

not argue that Dr. Cunningham cannot meet the third element, and in fact seem to concede the

---

[17] By Agreed Order, the Court dismissed Dr. Cunningham's Whistleblower Act claims against all individual defendants in their individual capacities, and against the University for punitive and injunctive relief.  [R. 9.]  Only his claim against the University for compensatory damages remains.

point.  [R. 92 at 23 (describing the third element, "or in this case, aided abetted, or substantiated the claim of another").]   Rather the Defendants argue that there is no evidence of a connection between his deposition and the Treating Provider designation, the initiation of termination proceedings was not an "unlawful reprisal," and there is no evidence of reputational harm. *Id.* at 23-24.  In response, Dr. Cunningham repeats his argument that the communications between the Defendants and Dr. Kyrkanides demonstrate causation.

Regardless of whether the termination proceedings were in fact unlawful reprisal, or whether there was evidence of reputational harm, the Court finds there is no evidence that the alleged acts of reprisal were causally connected to Dr. Cunningham's testimony, for the reasons outlined in the Court's First Amendment retaliation analysis.  This precludes a finding in favor of Dr. Cunningham because he cannot show the final Whistleblower Act element: that alleged acts of reprisal were taken to punish the employee for disclosing information about their employer. *Thornton*, 292 S.W.3d at 329.  Accordingly, the Court grants summary judgment for the Defendants on Dr. Cunningham's Whistleblower Act claim.[18]

**F**

Next, Defendants seek summary judgment against Dr. Cunningham's substantive due process claim.  [R. 107 at 32-34.]  In his Complaint, Dr. Cunningham alleges that Defendants violated his substantive due process rights by making statements about his alleged misconduct to law enforcement officials, other UK employees, prospective employers, and patients.  [R. 1-2 at 38-

---

[18] As with his First Amendment retaliation claim, neither party moved for summary judgment on Dr. Cunningham's Whistleblower Act claims based on denial of DSP membership, accusations of fraud, ostracization, hostile work environment, or initiation of termination proceedings. Again, there is no evidence of a causal connection between the *Mullins* testimony and any of these other alleged acts of reprisal.  Therefore, the Court will grant summary judgment to the Defendants for the entire Whistleblower Act claim.

39.]  The substantive component of the Due Process Clause protects fundamental rights created by the United States Constitution.  Fundamental rights are those specifically guaranteed by the United States Constitution and those rights that are "implicit in the concept of ordered liberty." *Palko v. Connecticut*, 302 U.S. 319, 325 (1937).  These generally include "the rights to marry, to have children, to direct the education and upbringing of one's children, to marital privacy, to use contraception, to bodily integrity, and to abortion."  *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (internal citations omitted).  Substantive due process rights have been specifically defined by the United States Supreme Court, and do not include the right to maintain employment, public or otherwise.  *See Seal v. Morgan*, 229 F.3d 567, 574-75 (6th Cir. 2000). However, the Supreme Court has also clarified that:

> The concept of "liberty" recognizes two particular interests of a public employee:
> 1) the protection of his or her good name, reputation, honor, and integrity; and 2)
> his or her freedom to take advantage of other employment opportunities.

*Sullivan v. Brown*, 544 F.2d 279, 283 (6th Cir. 1976) (citing *Board of Regents v. Roth*, 408 U.S. 564, 573-74 (1972).  Conduct that violates a party's substantive due process rights is conduct that "shocks the conscience."  *Mertik v. Blalock*, 983 F.2d 1353, 1367 (6th Cir. 1993) (citing *McMaster v. Cabinet for Human Resources*, 824 F.2d 518, 22 (6th Cir. 1997).

Dr. Cunningham alleges that Defendants Blackwell, Holloway, and Thro each violated his right to his reputation and right to be free to pursue employment opportunities.  [R. 95 at 29-31.] First, Dr. Cunningham asserts that Provost Blackwell, by removing his clinical privileges, "signaled to [his] colleagues and the oral surgery community at large that [he] was impaired, had committed fraud, abused patients, that [his] clinical skills had deteriorated, or the like."  *Id.* at 30. Dr. Cunningham next argues that Dr. Holloway "told [Dr. Cunningham's] colleagues at an August 5, 2019, Division Chiefs' meeting that [he was] asked to resign because [he] committed

fraud and claimed that this finding was affirmed by the U.S. Attorneys' Office." *Id.* Finally, Dr. Cunningham asserts that General Counsel Thro violated his rights by reporting his alleged fraud to the United States Attorney's Office. [*See* R. 95 at 4.] As a result of these alleged statements, Dr. Cunningham argues that his career and reputation were "destroyed." *Id.* at 31.

Defendants first argue that they never "directed anyone to tell patients that Dr. Cunningham was prohibited from performing clinical duties," and that no evidence exists to indicate that they informed any of Dr. Cunningham's potential employers of his alleged wrongdoing. [R. 92 at 32-33.] Specifically regarding General Counsel Thro, Defendants argue that, as General Counsel to the University, he had a duty to report any potential legal misconduct that an employee may have committed and, furthermore, did not reveal Dr. Cunningham's identity to the U.S. Attorney's Office. *Id.* at 33. Second, Defendants argue that no statement referenced by Dr. Cunningham "shocks the conscience" as to support a substantive due process claim for reputational injury. *Id.* at 33-34. In support, Defendants cite to *Mertik v. Blalock*. In *Mertik*, the Sixth Circuit agreed with a district court ruling that a city employee did not violate the substantive due process rights of a plaintiff who worked with children by falsely publicizing to third parties that she committed child abuse. 983 F.2d at 1368. Defendants argue that, by deciding that allegations of criminal child abuse did not "shock the conscience," the Sixth Circuit established that the "shocks the conscience" test is a high bar to surpass. [R. 92 at 34.]

Accordingly, the Court agrees that summary judgment is warranted in this matter. Although it is likely that a genuine issue of material fact exists as to whether the Defendants published false statements about Dr. Cunningham to third parties or whether those statements caused him injury, *Mertik* demands summary judgment be granted. Like the plaintiff in *Mertik*, Dr. Cunningham was accused of a crime which likely had an impact on his reputation and ability to

take advantage of other employment opportunities.  Because Sixth Circuit precedent indicates that the "shocks the conscience" test is not satisfied by an employer publicly accusing an employee of child abuse and pedophilia, however, the test likewise cannot be satisfied by an employer's accusation that an employee committed financial misconduct.  Accordingly, because Dr. Cunningham's substantive due process claim is based on statements that do not "shock the conscience," his claims against Defendants Blackwell, Holloway, and Thro are dismissed.

## G

Finally, Defendants seek summary judgment against Dr. Cunningham's defamation claim against Provost Blackwell.  [R. 92 at 42-45.]  Dr. Cunningham's complaint lists four statements that he claims to be defamatory.  [R. 1-2 at 46-47.]  Defendants argue they are entitled to summary judgment on this claim because no statements were published outside of the University and, in the alternative, the statements are subject to a qualified privilege.  [R. 92 at 42-45.]  In response, Dr. Cunningham raises false light as a "species of defamation," arguing Provost Blackwell's actions portrayed Dr. Cunningham in a false light.  [R. 95 at 36-37.]  He also claims Provost Blackwell's representations were knowingly false and malicious.  *Id.* at 37-38.  The University's reply argues a false light claim was not properly pled and, in the alternative, would fail as a matter of law.  [R. 97 at 11-12.]

As an initial matter, the Court agrees with the Defendants that Dr. Cunningham's attempt to raise a false light claim is improper.  The seminal Kentucky case adopting the false light tort portrays it as a basis for an invasion of privacy tort claim, not a defamation claim.  *McCall v. Courier-Journal and Louisville Times Co.*, 623 S.W.2d 882, 887 (Ky. 1981).  That case does state that defamation and invasion of privacy are "closely aligned," but refers to them as "*both* causes of action."  *Id.* at 888 (emphasis added).  The two claims are clearly separate actions and

33

Dr. Cunningham did not raise a false light claim in his complaint.  [*See* R. 1-2.]  Therefore, Dr. Cunningham cannot pursue this claim in his Response to Defendants' Motion for Summary Judgment.  *See Tucker v. Union of Needletraders, Industrial, and Textile Employees*, 407 F.3d 784, 788-89 (6th Cir. 2005) (upholding district court's refusal to consider a claim raised in Plaintiff's Response to Defendant's Motion for Summary Judgment when there was nothing in the Complaint to put Defendants on notice of the claim).

The Defendants moved for summary judgment on only the publication element of Dr. Cunningham's defamation claim.  [R. 92 at 43-44.]  They argue that there is no evidence Provost Blackwell's statements were published outside of the University.  *Id.*  However, Defendants cite to no case showing that publication within the University would not satisfy the publication element of a defamation claim.  This element simply requires the statement be "communicated to someone other than the party defamed."  *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 794 (Ky. 2004) (overruled on other grounds).  These statements were unquestionably shared with parties other than Dr. Cunningham when Provost Blackwell issued his Statement of Charges, which was then referred to a University Senate Advisory Committee.  [R. 92 at 16.]  Defendants' argument that there was no publication because the statements were not shared outside of the University is more appropriate for the application of the qualified privilege.

The Court next analyzes whether Provost Blackwell is shielded from liability by a qualified privilege.[19]  In Kentucky, a qualified or conditional privilege attaches to communications "made in good faith, without actual malice, by one who believes he has a duty or an interest to a person

---

[19] The Court construes this portion of the Defendants' motion as a Motion for Partial Summary Judgment. The Defendants address only the issues of publication and the application of the qualified privilege, and Dr. Cunningham responded by raising the false light claim and to the qualified privilege issue.  Neither party addressed the other defamation elements, so the Court will not grant summary judgment on the claim as a whole.

with a corresponding duty or interest." *Brewer American Nat. Ins. Co.*, 636 F.2d 150, 154 (6th Cir. 1980). Kentucky case law "has routinely applied this common-interest application of a qualified privilege to the employment context." *Toler v. Süd-Chemie, Inc.*, 458 S.W.3d 276, 283 (Ky. 2014) (internal quotations omitted). Qualified privileges, however, "must be exercised in a reasonable manner and for a proper purpose. The immunity is forfeited if the defendant steps outside the scope of the privilege or abuses the occasion." *Stringer*, 151 S.W.3d at 797. Abuse of the qualified privilege can occur by:

> (1) the publisher's knowledge or reckless disregard as to the falsity of the defamatory matter; (2) the publication of the defamatory matter for some improper purpose; (3) excessive publication; or (4) the publication of the defamatory matter not reasonably believed to be necessary to accomplish the purpose for which the occasion is privilege.

*Toler*, 458 S.W.3d at 284.

The Court agrees with the Defendants that Provost Blackwell's statements in the Statement of Charges are protected by this qualified privilege. Internal University communications about an employee's alleged misconduct, made for the purpose of evaluating the employee's performance and considering discipline, are privileged. *Harstad v. Whiteman*, 338 S.W.3d 804, 811 (Ky. Ct. App. 2011). However, there remains a genuine question of material fact as to whether the privilege was abused. Provost Blackwell stated in his Statement of Charges: "Dr. Cunningham stole from the University" and "falsified medical records." [R. 92-28.] These statements accuse Dr. Cunningham of criminal activity, and it is not clear that his actions rise to this level of severity. Therefore, there remains a material issue of genuine fact about the truth of Provost Blackwell's statements in his Statement of Charges. Because the qualified privilege requires "knowledge or reckless disregard as to the *falsity* of the defamatory matter," Court declines to grant summary judgment on Dr. Cunningham's defamation claim.

**H**

Next, the Court turns to Defendants' remaining arguments that qualified immunity shields

them from liability.  [R. 92 at 45-47.]  Qualified immunity is a doctrine that shields government

officials, including public university administrators, who perform discretionary functions from

civil liability "unless their conduct violates clearly established rights."  *Quigley v. Tuong Vinh*

*Thai*, 707 F.3d 675, 680 (6th Cir. 2013) (citing *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir.

2011)); *see also Corbett v. Garland*, 228 F. App'x 525, 529 (6th Cir. 2007) (finding qualified-

immunity defense applied to university president and reversing district court's order granting

plaintiff's Motion for Summary Judgment).  The question of whether qualified immunity attaches

to an official's actions "is a purely legal question for the trial judge to determine prior to

trial." *Garvie v. Jackson*, 845 F.2d 647, 649 (6th Cir. 1988). "[A] defendant is entitled

to qualified immunity on summary judgment unless the facts, when viewed in the light most

favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated

a constitutional right; and (2) the right was clearly established."  *Id.* (citing *Pearson v. Callahan*,

555 U.S. 223, 232, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009).  Either prong may be addressed

first, depending on the circumstances of the case before the court, and both prongs must be

satisfied for the plaintiff to demonstrate that the defendant is not entitled

to qualified immunity.  *See Pearson*, 555 U.S. at 236; *see also Sumpter v. Wayne Cty.*, 868 F.3d

473, 480 (6th Cir. 2017) ("A plaintiff must satisfy both inquiries in order to defeat the assertion

of qualified immunity.") (citing *Wesley v. Campbell*, 779 F.3d 421, 428-29 (6th Cir. 2015)).

The term "clearly established" means that the law was, at the time of the individual's conduct,

"'sufficiently clear' that every 'reasonable official would understand that what he is doing' is

unlawful" and the law placed the constitutionality of the conduct "beyond debate."  *District of*

*Columbia v. Wesby*, 138 S. Ct. 577, 589, 199 L. Ed. 2d 453 (2018) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).  A legal principle must also have a "sufficiently clear foundation in then-existing precedent" and be "settled law" to be clearly established.  *Id.* Once qualified immunity has been invoked, the plaintiff bears the burden of showing that qualified immunity is not appropriate.  *Quigley*, 707 F.3d at 681 (citing *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006)).

    Having been unsuccessful in attaining summary judgment on the merits, one constitutional claim remains pending against Defendants: Dr. Cunningham's procedural due process claim regarding the revocation of his clinical duties, clinical privileges, DSP income, and employment. Because the Court has determined Dr. Cunningham's constitutional right to procedural due process may have been violated, it must now be determined whether the law was "clearly established" as to preclude that violation.  Defendants argue qualified immunity shields them from liability because the law was not clearly established that a doctor has a protected property interest in his or her clinical duties.  [R. 92 at 46.]  In response, Dr. Cunningham argues that Defendants cite to no case which precludes every doctor from possessing a property interest in his clinical duties, but, instead, only cited to case law which indicates that, in certain situations, the property interest might not be present.  [R. 95 at 39.]

    The Court agrees with Dr. Cunningham because the Sixth Circuit has clearly established that a doctor holds a property interest in his clinical duties.  In *Crabtree v. Cookeville*, a doctor was suspended from his clinical duties for one day before he was given a hearing to determine whether he had committed misconduct.  1989 U.S. App. LEXIS 17554 at *4 (6th Cir. 1989). Though the parties agreed that the Plaintiff doctor held a property interest in his clinical duties, the Court declined to determine whether his interest had been violated because his one-day

suspension was deemed *de minimis*.  *See id.* at *5-*7.  However, the Court, also in agreement that a property interest did exist, indicated:

> [i]f Dr. Crabtree had been suspended for two weeks or if the suspension were punitive, he probably would be entitled to some sort of notice and opportunity to respond before the deprivation unless an emergency required immediate suspension. But because the deprivation of property was de minimis, we need not go into an extended analysis of what process would be required if the deprivation had been greater.

*Id.* at *6-*7.  In this matter, Dr. Cunningham was forbidden from engaging in clinical practice for a little over five months.  [R. 63-4 at 22; 29.]  Because the Sixth Circuit ruled that a *two-week* suspension would "probably" require notice and a hearing, it is illogical for Defendants to argue that a suspension of *five months* would not meet the threshold of a deprivation.  Moreover, the Sixth Circuit clearly indicates that clinical duties are a property interest because the Court stated described the doctor's suspension from clinical duties as a "deprivation of *property*," albeit one which was situationally *de minimis*.  *See id.*  Consequently, the law was settled decades before any potential deprivation committed by Defendants and, as a result, qualified immunity does not act as a shield from liability. *See also Benjamin v. Schuller*, 400 F.Supp.2d 1055 (S.D. OH. 2005) (addressing the sufficiency of a hearing in which a doctor's clinical privileges were revoked and thereby clearly finding the presence of a protected interest).

The law was similarly clearly established that a public employee has a property interest in their employment.  *Cox v. Shelby State Community College*, 48 F. App'x 500, 507 (6th Cir. 2012).  Further, it is well settled that constructive discharge can constitute a deprivation of that property interest.  *Nunn v. Lynch*, 113 F. App'x 55, 59 (6th Cir. 2004).  Therefore, the Defendants are also not protected by qualified immunity against Dr. Cunningham's procedural due process claim based on his alleged constructive discharge.

38

## I

Finally, the Court turns to Defendants' argument that Dr. Cunningham has failed to provide sufficient evidence that the actions of General Counsel Thro or Dean Holloway caused Dr. Cunningham harm.  Accordingly, Defendants seek dismissal of General Counsel Thro and Dean Holloway from all claims.  [R. 92 at 49-50.]  Regarding Mr. Thro, Defendants assert that, as legal counsel, he could take no action against Dr. Cunningham and, instead, simply advised other members of the University administration.  *Id.*  Regarding Dean Holloway, Defendants state that "Dr. Blackwell [] was the decision-maker concerning Dr. Cunningham's reassignment and the decision to bring faculty termination proceedings against Dr. Cunningham," and, therefore, Dean Holloway cannot be held liable.  *Id.* at 50. In response, Dr. Cunningham argues that the decision to cause him harm resulted from a "joint effort" of all Defendants, including Mr. Thro and Dean Holloway.  [R. 95 at 42.]  Accordingly, he asserts that a genuine issue of material fact exists as to their liability, and they should not be dismissed.  The Court agrees with Dr. Cunningham that there is a material issue of genuine fact as to Defendants' Thro and Holloway's liability.

## III

So, where do these rulings leave Dr. Cunningham's claims against the University Defendants? Dr. Cunningham's procedural due process claim remains, but only the issues of (1) whether he was deprived of his property interest in his employment through constructive discharge when his right to perform clinical services was stripped, and (2) whether the process he received for both alleged deprivations was sufficient.  For the other issues relevant to that claim, summary judgment is granted to Dr. Cunningham.  The breach of contract claim against the University for forbidding Dr. Cunningham's clinical activities and denying him DSP membership remains. However, summary judgment is granted to the University on Dr. Cunningham's breach of

contract claim for denial of DSP income for performed services.  Also, the wage and hour claim for performed work against the University remains.  [*See* R. 9.]  Finally, Dr. Cunningham's defamation claim against Provost Blackwell remains.  Otherwise, summary judgment is granted to the Defendants.  Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

1. Dr. Cunningham's Motion for Summary Judgment [R. 63] is **GRANTED AND DENIED IN PART**.  Summary judgment is **GRANTED** in favor of Dr. Cunningham against Defendants as to the subparts of **Count II** regarding his property interest in his right to perform clinical services and the deprivation of that interest, and regarding his property interest in his employment;

2. Defendants Blackwell, Holloway, Thro, and the University of Kentucky's Motion for Summary Judgment [R. 92] is **GRANTED AND DENIED IN PART**. Summary Judgment is **GRANTED** in favor of Defendants Blackwell, Holloway, and Thro as to **Count I**.  Summary Judgment is **GRANTED** in favor of the Defendants as to the subpart of **Count II** regarding Dr. Cunningham's "stigma plus" claim.  Summary judgment is **GRANTED** in favor of Defendants Blackwell, Holloway, and Thro as to **Count III**. Summary judgment is **GRANTED** in favor of the University as to the subpart of **Count IV** regarding the claim of breach based on services provided.  Summary Judgment is **GRANTED** to the Defendants as to the subpart of Dr. Cunningham's wage and hour Claim, **Count V**, based on unperformed work.  Summary judgment is **GRANTED** for Defendants Blackwell, Holloway, and Thro as to **Count VI**.

3. The Court **DENIES** summary judgment in favor of either party as to the subparts of **Count II** regarding the sufficiency of the process Dr. Cunningham received and

regarding whether Dr. Cunningham was constructively discharged.  The Court **DENIES** summary judgment for either party on the subpart of **Count IV** alleging breach of contract for Dr. Cunningham's DSP membership and clinical duties.  The Court **DENIES** summary judgment for either party on the subpart of **Count V** alleging wage and hour violations for work Dr. Cunningham performed.  The Court **DENIES** summary judgment for **Count VII**.

This the 21st day of October, 2021.

Gregory F. Van Tatenhove
United States District Judge