UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | |
|---|---|
| DR. LARRY CUNNINGHAM, | ) |
| Plaintiff, | ) Civil No. 3:20-cv-00008-GFVT-EBA |
| v. | ) |
| DAVID W. BLACKWELL, *et al.*, | ) **MEMORANDUM OPINION** |
| Defendants. | ) **&** |
| | ) **ORDER** |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on a Motion to Reconsider Summary Judgment filed by Defendant Dr. Stephanos Kyrkanides. [R. 143.] The Court previously declined to grant summary judgment in Dr. Kyrkanides's favor on a state wage and hour claim and on part of a defamation claim brought against him by Dr. Larry Cunningham. [R. 119.] Now, Dr. Kyrkanides asks the Court to reexamine those decisions. [R. 143.] Because none of his concerns amount to clear error, Dr. Kyrkanides's Motion to Reconsider **[R. 143]** is **DENIED**.

**I**

The University of Kentucky employed Dr. Larry Cunningham as an oral surgeon and faculty member from 2001 through July of 2019. [R. 63-4 at 1.] During that time, Dr. Cunningham treated patients at an off-campus Faculty Clinic operated by UK. *Id.* at 2. Through the university's Dental Service Plan, Dr. Cunningham could receive a portion of the fees paid to UK if he was designated as the Treating Provider for a given patient. *Id.* at 4–5. Sometime in 2017, someone changed the policy that governed whether Dr. Cunningham would receive that

designation.[1]  *Id.* at 6; [R. 143 at 4–5.]  Dr. Cunningham, then, changed his documentation practices to ensure that he would receive compensation.  [R. 71-4 at 9.]  Whether UK validly changed its policy and whether Dr. Cunningham truly should have been the Treating Provider for these patients are issues that remain disputed.  *See id.* at 7; [R. 118 at 21 n.14.]

At UK's Faculty Clinic, faculty dentists and resident dentists would both see a patient through the course of treatment.  [R. 63-4 at 3; R. 67-3 at 7.]  To further their training, the residents conducted faculty-supervised consultations with patients and documented the care.  [R. 63-4 at 3; R. 67-3 at 7.]  Prior to 2017, a UK guidance document approved by the UK Dental Care Board required billing staff to designate the faculty member as the Treatment Provider for patients where a resident helped with treatment and documented the care.[2]  [R. 63-4 at 6; R. 67-3 at 7.]

Sometime in 2017, UK's billing employees began designating residents as the Treatment Provider whenever residents documented a patient's care.  [R. 67-4 at 6; R. 67-3 at 9.]  Dr. Cunningham claims to have noticed this change in some of his cases by the fall of 2017.  [R. 1-2 at 16.]  He alleges that the Dean of the College of Dentistry, Dr. Stephanos Kyrkanides, effectively changed UK's billing policy without following the mandatory procedures to do so.  [R. 63-4 at 6–7.]  Dr. Kyrkanides denies this claim.  [R. 143 at 6; R. 146 at 1.]  By contrast, Dr.

---

[1] The parties dispute who changed the policy.  [R. 143 at 5; R. 144 at 4.]

[2] The 2013 document reads, in full:

> If a patient is appointed to a particular Faculty member or Faculty Clinic, and a Faculty member provides care to the patient, billed charges will be recorded with the Treatment Provider listed as the provider number of the Faculty who provided care.  These appointments may involve Residents in taking and documenting the patient's History & Physical Exam and in surgical follow-up evaluations; however, the Faculty member assigned to the patient will still be listed as the axiUm Treatment Provider.

Notice of Filing, Attachment McConnell Deposition at 161, *Shehata v. Blackwell*, No. 3:20-cv-00012-GFVT (E.D. Ky. June 17, 2021), ECF No. 70-1.  UK disputes both the applicability of this document to the patients at issue and whether it constitutes formal University policy.  [*See* R. 63-4 at 5.]

Kyrkanides claims that the UK Dental Care Board revised the policy in November of 2017. [R. 143 at 5.]

Regardless, both parties agree that Dr. Cunningham changed his documentation practices around this time. [R. 63-4 at 9; R. 67-3 at 8.] From April of 2017 through July of 2018, UK designated a resident as the Treatment Provider for eighty-nine patients that Dr. Cunningham alleges he treated. [R. 63-4 at 37; R. 63-21.] Dr. Cunningham believed that he was entitled to income for these patients under UK's existing policies, even though a resident wrote the documentation for their treatment. [R. 63-4 at 9–10.] Accordingly, he reviewed the files and removed any reference to a resident from the notes for these patients. *Id.* at 10.

Dr. Kyrkanides characterizes these actions differently. He claims that UK staff inferred, from the fact that a resident chronicled the care of a patient, that the resident performed the care for that patient. [R. 143 at 4.] Further, Dr. Kyrkanides claims that the manner of documentation in these patients' files is consistent with other cases where it is known that a resident performed all the care. *Id.* at 5. Accordingly, he believes that Dr. Cunningham altered patient records to illegitimately increase his income. *Id.* at 3.

The altered records triggered an investigation within the University. [R. 71-4 at 10; R. 67-3 at 10.] While the investigation ultimately concluded without discipline, UK's Provost, David Blackwell, would soon after accuse Dr. Cunningham of fraud for "claiming credit for services which he did not perform." [R. 63-4 at 12, 21.] Through the course of the investigation and the subsequent fallout, Dr. Kyrkanides sent eleven emails and recorded phone calls to UK administrators. [R. 67-4 at 429–36.] He accused Dr. Cunningham of various crimes and of stealing from the university based on the altered patient records. *Id.* These allegations

3

eventually led Dr. Cunningham to resign. *Id.* at 29. In 2019, Dr. Kyrkanides also lost his position as Dean. [R. 144 at 5; R. 67-3 at 4.]

Dr. Cunningham sued Dr. Kyrkanides on a variety of bases, including violations of Kentucky's wage and hour law, for the patients he believes he treated, and defamation, over the eleven statements. [R. 1-2 at 41; R. 53 at 4.] Dr. Kyrkanides moved for summary judgment on these claims. [R. 67-3.] The Court denied summary judgment on the wage and hour claim, finding that a material issue of fact exists as to whether Dr. Cunningham is entitled to income he allegedly earned before Dr. Kyrkanides lost his deanship. [R. 119 at 10–11.] The Court granted summary judgment against Dr. Cunningham as to ten of the defamatory statements because of the statute of limitations. *Id.* at 12. However, the Court preserved one of the communications for the jury, despite Dr. Kyrkanides's invocation of Kentucky's doctrine of qualified privilege. *Id.* Dr. Kyrkanides now asks the Court to reconsider these decisions. [R. 143.]

**II**

A federal district court has the authority to reconsider interlocutory orders under both the common law and Federal Rule of Civil Procedure 54(b). *Rodriguez v. Tenn. Laborer's Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004). Traditionally, courts only reconsider interlocutory orders "when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice."[3] *Id.* A motion to reconsider an interlocutory order is not an invitation for the parties to relitigate the issue. *See Hazard Coal Corp. v. Am. Res. Corp.*, Civil No. 6:20-cv-00010-CHB, 2022 U.S. Dist.

---

[3] That said, district courts have the power to revisit their interlocutory summary judgment decisions "for any reason." *ACLU of Ky. v. McCreary Cnty.*, 607 F.3d 439, 450 (6th Cir. 2010); *see also Dayton Veterans Residences Ltd. P'ship v. Dayton Metro. Hous. Auth.*, No. 21-3090, 2021 U.S. App. LEXIS 34511, at *15–17 (6th Cir. Nov. 19, 2021) (discussing the *Rodriguez* factors but noting that, under *ACLU of Kentucky*, district courts have authority to reconsider summary judgment for reasons outside those factors).

LEXIS 238150, at *15 (E.D. Ky. Sep. 9, 2022). These motions do not permit parties to raise arguments or to present evidence that was available to them at the time of summary judgment. *Energy Ala. v. TVA*, No. 2:20-cv-02615, 2022 U.S. Dist. LEXIS 184826, at *4 (W.D. Tenn. July 14, 2022).

### A

Dr. Kyrkanides has not demonstrated that the Court committed clear error in refusing to grant summary judgment on Dr. Cunningham's wage and hour claim. In its summary judgment order, the Court found that there remained a material issue of fact as to whether some of Dr. Cunningham's wages were "agreed upon" for the purposes of Kentucky's wage and hour withholding statute. [R. 119 at 10–11.] The statute only permits an action for wages that are "agreed upon" in that there is no "bona fide dispute concerning wages." [R. 118 at 20–21 (citing *Kimmel v. Progress Paint Mfg. Co.*, 2003 Ky. App. Unpub. LEXIS 1, *9 (Ky. Ct. App. Jan. 10, 2003)).] Dr. Cunningham argued that he is owed one-thousand-seven-hundred-thirty-three dollars and sixty cents ("$1,733.60"), plus interest, for eighty-nine patients that he treated. [R. 63-4 at 37, 40.]

Dr. Kyrkanides presents three arguments that the Court committed clear error. First, he suggests that summary judgment was appropriate because Dr. Cunningham never presented any evidence that he was entitled to the income at issue. [R. 143 at 7.] Second, he asserts that Dr. Cunningham was not entitled to compensation under the statute because the DSP was always subject to change. *Id.* at 8. Last, he contends that he is immune from suit under the wage and hour law. *Id.*

**1**

Dr. Kyrkanides's first argument fails to accurately portray the issue before the Court and the evidence submitted. He alleges that the College of Dentistry revised its DSP policy to clarify that faculty are not entitled to payment for the work of residents. [R. 143 at 5.] Then, he suggests that there is no proof that anyone other than residents treated the patients at issue. *Id.* at 7. In fact, it is unclear whether UK effectively revised its policy. And Dr. Cunningham has submitted evidence that he treated the patients.

Dr. Cunningham's claim is that both he and the residents treated the patients at issue. [*See* R. 63-4 at 3–4 (describing treatment practices at the faculty clinic).] He claims that the official policy in place during the relevant period required the faculty member to be designated as the Treatment Provider for work done by a resident and a faculty member together. *Id.* at 6; *see also* Notice of Filing, Attachment McConnell Deposition at 161, *Shehata v. Blackwell*, No. 3:20-cv-00012-GFVT (E.D. Ky. June 17, 2021), ECF No. 70-1. Dr. Cunningham submitted deposition testimony that suggests that he and a resident collaborated on the care for the patients at issue. [R. 71-4 at 13 (citing R. 66-3 at Page ID# 960–61; R. 62-21 at Page ID# 3286–87; R. 62-4 at Page ID# 1257; R. 62-7 at PageID# 1948–49).]

When UK investigated the documentation issue, it concluded that, in all instances, Dr. Cunningham either treated the patients at the same time as residents or saw them after an initial evaluation by the residents. [*See* R. 62-9 at 292 ("All of the residents indicated that at Turfland the patient visits occurred in two ways. The first was when the resident would see the patient first and work up the patient. The resident would then present to the attending, and the attending would go in and re-evaluate the patient. The second was when the resident and attending would see the patient together and evaluate the patient simultaneously. None of the residents witnessed

6

an instance where the patient left and did not see an attending.")] During her deposition, the investigator who conducted UK's inquiry concluded that Dr. Cunningham was in the room during patient visits and evaluated the patients. [R. 79 at 3 n.4 (citing R. 62-9 at PageID# 2391, 2408.)] To be sure, a reasonable jury could agree with Dr. Kyrkanides that Dr. Cunningham's decision to alter the patient notes is evidence that he did not treat the patients at issue. [R. l43 at 7.] But, construing the evidence in the light most favorable to Dr. Cunningham, there is a basis for a reasonable jury to conclude that he did treat the patients. *See Boshaw v. Midland Brewing Co.*, 32 F.4th 598, 602 (6th Cir. 2022) (during summary judgment, a court draws all reasonable inferences in favor of the non-moving party).

Moreover, the parties spilled much ink arguing whether the College of Dentistry changed the applicable policy prior to Dr. Cunningham's decision to revise the patient records. But neither party has convincingly shown that their alleged policy change occurred before Dr. Cunningham treated all of the patients at issue. Accordingly, it remains possible that UK's prior DSP policy remained in place when Dr. Cunningham treated these patients. Again, Dr. Cunningham alleges that the 2013 policy required him to be paid for patients that were treated by himself and a resident working together.

Dr. Cunningham believes that Dr. Kyrkanides either created an unofficial rule or worked in the shadows to create confusion as to the existing rule. [R. 144 at 4–5.] He believes this conduct was an intentional effort to penalize him by decreasing his DSP income. *Id.* at 4. In his complaint, Dr. Cunningham alleges that he first noticed discrepancies with his DSP income in the fall of 2017. [R. 1-2 at 16.] But his claim that Dr. Kyrkanides caused the August discrepancy is based on speculation. He relates that "[o]n an unknown date a decision was made to change how the treating provider was identified for . . . faculty clinic patients." [R. 63-4 at 6.]

7

He tries to connect that change to Dr. Kyrkanides by pointing to an email where a UK staff member related that "Jill T" instructed her "to post the charges that way." [R. 63-4 at 6 n.21 (citing R. 63-8); R. 63-8 at 1.] The email exchange occurred in February of 2018, so its connection to Dr. Cunningham's alleged change in billing practices is tenuous. *See id.*

For his part, Dr. Kyrkanides suggests that the Dental Care Board properly revised the policy in a way that would prevent Dr. Cunningham from receiving payment. [R. 143 at 5.] This suggestion is problematic for several reasons. It not clear that the alleged rule change occurred before the treatment at issue. [*Compare* R. 1-2 at 16 (alleging that Dr. Cunningham first noticed the billing issues in the fall of 2017), *and* R. 63-21 (showing one patient, for whom Dr. Cunningham seeks wages, was treated in April of 2017), *with* R. 67-1 at 107 (email submitted by Dr. Kyrkanides as evidence of the policy change dated November 15, 2017).] Moreover, the change to the policy that Dr. Kyrkanides alleges would have affected "patients appointed and treated by residents . . . *only* . . . ." [R. 67-1 at 107 (emphasis added).] Dr. Kyrkanides appears to have recognized this limitation to the rule change and continued to push for a more restrictive rule. *See id.* (Kyrkanides responding "How about if the patients had an appointment with the faculty but the residents did the work?"). Dr. Cunningham's claim is that he and a resident treated these patients together. Accordingly, even if Dr. Kyrkanides is correct about the policy change, Dr. Cunningham may still be able to prove that he earned the income at issue.[4]

### 2

Dr. Kyrkanides's second ground for reconsideration also lacks merit. Dr. Kyrkanides argues that "[s]ince the DSP policy was always subject to change, Plaintiffs were never 'entitled' to any wages based on that policy." [R. 143 at 8.] Dr. Kyrkanides already made this argument in

---

[4] To be clear, Dr. Cunningham claims that the November 2017 Dental Care Board meeting did not affect the relevant policy. [R. 144 at 5.]

8

his motion for summary judgment. [R. 67-3 at 33 ("The wages that Plaintiffs allege they should have earned under the DSP policy were always subject to change.")] For that reason alone, this contention is not a valid reason for reconsideration. *See Hazard Coal Corp.*, 2022 U.S. Dist. LEXIS 238150, at *15.

And the argument has not improved with time. UK's ability to change the DSP policy has no bearing on whether Dr. Cunningham earned income under whatever policy was actually in place. Instead, there are two issues of fact that remain unresolved. What was UK's Treatment Provider designation procedure when the patients were treated? And who treated the patients? If, as Dr. Cunningham suggests, the DSP policy required him to be compensated for patients treated jointly by a faculty member and a resident, and if Dr. Cunningham worked with a resident to treat the patients, then he earned the income regardless of UK's ability to change the policy.

### 3

Finally, Dr. Kyrkanides argues that Kentucky's doctrine of qualified official immunity barred Dr. Cunningham's wage and hour law claim against him. [R. 143 at 8.] In his motion for summary judgment, Dr. Kyrkanides's argument on this issue read, in full, "Kyrkanides is immune from liability under state law pursuant to qualified immunity because any alleged changes he made to the DSP that may or may not have impacted Plaintiffs' wages, were discretionary rather than ministerial." [R. 67-3 at 34 (citing *Pauly v. Chang*, 498 S.W.3d 394, 404 (Ky. Ct. App. 2015)).] The Court dismissed this argument, citing the adage that "[i]ssues adverted to in a perfunctory manner, without some effort to develop an argument, are deemed forefeited." [R. 119 at 11 quoting *Williamson v. Recovery Ltd. P'Ship*, 731 F.3d 608, 621 (6th Cir. 2013).] Now, Dr. Kyrkanides seeks to brief the issue more thoroughly.

9

He cannot. Dr. Kyrkanides does not suggest that there has been a change in the law of qualified official immunity. *Rodriguez*, 89 F. App'x at 959. Nor can he relitigate the issue in this motion. *Hazard Coal Corp.*, 2022 U.S. Dist. LEXIS 238150, at *15. Kentucky's doctrine of qualified immunity is a notoriously complex area of law. *See Marson v. Thomason*, 438 S.W.3d 292, 296 (Ky. 2014) ("The question of when a task is ministerial or discretionary has long plagued litigants and the courts."). Prior to summary judgment, Dr. Kyrkanides made no effort to develop his argument on the doctrine's central question of whether an act is discretionary or ministerial. [*See* 67-3 at 34.] Instead, he relied on a mere conclusory statement. That did not suffice prior to summary judgment, and he cannot use a motion to reconsider to augment his deficient effort.

Regardless, the issue will require resolution by the jury. Under Kentucky law, sovereign immunity extends to discretionary acts performed by public officials. *Marson*, 483 S.W.3d at 296. This doctrine prevents courts from reviewing, through tort actions, policy decisions made in an uncertain environment. *Id.* at 297. However, to assert qualified official immunity as a defense, defendants must demonstrate that they acted within the scope of their authority. *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001).

Even if Dr. Cunningham can prove that Dr. Kyrkanides changed the DSP policy, Dr. Kyrkanides believes that he is entitled to immunity. [R. 143 at 8.] He believes that any change would have been a discretionary decision. *Id.* Conversely, Dr. Cunningham alleges that Dr. Kyrkanides changed the DSP policy unilaterally, without following UK's required process. [R. 144 at 10.] He argues that Dr. Kyrkanides acted outside the scope of his employment and cannot claim the protection of immunity. *Id.*

10

As discussed at length, no one in this case has conclusively shown what DSP policy was in place at the beginning of 2017, whether someone changed it, and, if so, who made that change. The Court cannot grant immunity to Dr. Kyrkanides because, viewing the evidence in the light most favorable to Dr. Cunningham, a jury could conclude that Dr. Kyrkanides lacked the power to unilaterally change the DSP policy. *See Boshaw*, 32 F.4th at 602. Summary judgment is simply not appropriate on this claim.

## B

Dr. Kyrkanides asserts that the Court applied the wrong legal standard to Dr. Cunningham's defamation claim. [R. 143 at 11.] Dr. Kyrkanides raised the defense of qualified privilege against the defamation claim. [R. 67-3 at 35.] To overcome that defense, Dr. Cunningham had to show that Dr. Kyrkanides abused the privilege. *Toler v. Süd-Chemie, Inc.*, 458 S.W.3d 276, 284 (Ky. 2014). Relying on an argument made by co-Defendant David Blackwell, Dr. Kyrkanides suggests Dr. Cunningham needed to prove that Dr. Kyrkanides knowingly uttered a false statement about Dr. Cunningham or that he recklessly disregarded the possibility that his statement was not true.[5] [R. 162 at 11.] But Dr. Kyrkanides's situation is meaningfully different from Provost Blackwell's contention. Because the Court relied on a different, correct test for abuse of the privilege, there is no clear error.

Under Kentucky law, the elements of a defamation claim are:

> (a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

*Toler*, 458 S.W.3d at 282. Generally, a statement is actionable per se if it involves false allegations of unfitness to perform a job. *Id.* An exception to this per se rule exists if the societal

---

[5] The Court granted Provost Blackwell's motion to reconsider along these lines. [R. 164.]

11

interest in the unrestricted flow of information is greater than the private interest in redressing reputational harm. *Id.*

This qualified privilege protects the speaker "where the communication is one in which the party has an interest and it is made to another having a corresponding interest." *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 793 (Ky. 2004). In the employment context, it applies to internal discussions and communications that are necessary to a company's proper function and the enforcement of the law. *Dossett v. N.Y. Mining & Mfg. Co.*, 451 S.W.2d 843, 846 (Ky. 1970). There, the public interest in detecting wrongdoing outweighs the private interest in an action for defamation if the suspicions are alleged in good faith. *See id.* Accordingly, the privilege "will provide protection despite a statement's falsity . . . ." *Toler*, 458 S.W.3d at 284.

To protect this socially valuable speech, Kentucky law places the burden on the plaintiff to defeat an assertion of qualified privilege. *Id.* The party bearing the privilege cannot abuse it. *Id.* at 283. A plaintiff can overcome the privilege by showing "both actual malice and falsity . . . ." *Id.* A showing of actual malice depends "not so much [on] *what* was said as . . . *how* it was said." *Id.* at 284. So, a plaintiff can defeat the privilege by showing:

> (1) the publisher's knowledge or reckless disregard as to the falsity of the defamatory matter; (2) *the publication of the defamatory matter for some improper purpose*; (3) excessive publication; *or* (4) the publication of defamatory matter not reasonably believed to be necessary to accomplish the purpose for which the occasion is privileged.

*Id.* (quoting Restatement (Second) of Torts § 596 cmt. a (1977)) (emphasis added).

Kentucky law interprets the malice requirement as distinct from the falsity requirement. *See id.* at 287 ("both malice *and* falsity must be shown for a plaintiff to overcome the qualified privilege."). Accordingly, a plaintiff cannot defeat a motion for summary judgment by merely alleging that a statement is false. *See id.* at 286 (applying this rule to a motion for directed

verdict); *see also Harstad v. Whiteman*, 338 S.W.3d 804, 813 (Ky. Ct. App. 2011) (applying to summary judgment). Otherwise, the qualified privilege would not protect false statements uttered within its scope, meaning those that are wrong but offered in good faith. *Toler*, 458 S.W.3d at 287. At bottom, "the mere allegation of falsity" does not "permit an inference of malice." *Id.*

Unlike in Provost Blackwell's case, the Court did not rely on falsity alone to deny summary judgment. [*See* R. 164 at 5–6.] Instead, the Court found that Dr. Cunningham adduced some evidence that Dr. Kyrkanides published "the defamatory matter for some improper purpose." *Toler*, 458 S.W.3d at 284. "[E]vidence in this matter suggests that Dr. Kyrkanides was 'obsessed' with ensuring that Dr. Cunningham was punished." [R. 119 at 13.] The Court cited deposition testimony from Provost Blackwell that indicated that Dr. Kyrkanides's obsession was known within the University. *Id.* Accordingly, the Court decided that the matter was properly reserved for a jury. *Id.* at 14.

This was not error. Under Kentucky law, generally "whether a defendant abused its qualified privilege is a question of fact properly reserved for the jury." *Toler*, 458 S.W.3d at 285. The qualified privilege protects only defamatory statements made within its scope. *Id.* at 287. In the context of an internal employment issue, that scope encompasses "communications that are necessary to a company's proper function and the enforcement of the law." *Dossett*, 451 S.W.2d at 846. It may be the case that Dr. Kyrkanides's statements were properly dedicated to that purpose. [*See* R. 143 at 12–13 (arguing that Dr. Kyrkanides had a duty to report this information).] But, drawing all inferences in favor of Dr. Cunningham, a reasonable jury could conclude that Dr. Kyrkanides pursued a personal vendetta against Dr. Cunningham. *See Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001) (during summary judgment, a court draws all

13

reasonable inferences in favor of the non-moving party). If a jury chose to make that inference, it could reasonably conclude that Dr. Kyrkanides exceeded the bounds of the qualified privilege by acting with an improper purpose.

### III

In sum, none of Dr. Kyrkanides's arguments for reconsideration are persuasive. Accordingly, he cannot show a need to correct a clear error or prevent manifest injustice. *See Rodriguez v. Tenn. Laborer's Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004). For these reasons, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** that Dr. Kyrkanides's Motion to Reconsider **[R. 143]** is **DENIED**.

This the 15th day of June 2023.

Gregory F. Van Tatenhove
United States District Judge