UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
FRANKFORT

| | |
|---|---|
| DR. LARRY CUNNINGHAM, | ) |
| Plaintiff, | ) ) ) Civil No. 3:20-cv-00008-GFVT-EBA |
| v. | ) ) ) **MEMORANDUM OPINION** |
| DAVID W. BLACKWELL, *et al.*, | ) ) **&** |
| Defendants. | ) ) **ORDER** ) ) |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on supplemental briefing submitted by Dr. Larry Cunningham and Dr. David Blackwell on one of Dr. Cunningham's defamation claims. [R. 165; R. 168.] In his role as provost of the University of Kentucky, Dr. Blackwell issued a Statement of Charges against Dr. Cunningham that alleges four misdeeds. Dr. Blackwell invokes Kentucky's doctrine of qualified privilege as to these four statements, which insulates supervisors from liability for making some false remarks in the employment context. To overcome this privilege, Dr. Cunningham claims that Dr. Blackwell knew or recklessly disregarded the possibility that the four allegations were false. Dr. Cunningham has only adduced genuine evidence that Dr. Blackwell spoke maliciously in issuing one of these statements. Accordingly, the Court will issue summary judgment in favor of Dr. Blackwell as to three of the allegations but allow a jury to decide whether Dr. Blackwell can invoke the qualified privilege as to his statement that Dr. Cunningham stole from the University of Kentucky.

**I**

The University of Kentucky employed Dr. Larry Cunningham as both a medical doctor and a licensed oral surgeon from 2001 through July of 2019. [R. 63-4.] During that time, Dr. Cunningham treated patients at an off-campus Faculty Clinic operated by UK. *Id.* at 2. Through the University's Dental Service Plan, Dr. Cunningham could receive a portion of the fees paid to UK if he was designated as the Treating Provider for a given patient. *Id.* at 4–5. Sometime in 2017, someone changed the policy that governed whether Dr. Cunningham would receive that designation.[1] *Id.* at 6; [R. 143 at 4–5.] Dr. Cunningham, then, changed his documentation practices to ensure that he would receive compensation. [R. 92 at 9.] Whether UK validly changed its policy and whether Dr. Cunningham truly should have been the Treating Provider for these patients are issues that remain disputed. [R. 118 at 21 n.14.]

At UK's Faculty Clinic, faculty dentists and resident dentists would both see a patient through the course of treatment. [R. 63-4 at 3.] To further their training, the residents conducted faculty-supervised consultations with patients and documented the care. *Id.* Prior to 2017, a UK guidance document approved by the UK Dental Care Board required billing staff to designate the faculty member as the Treatment Provider for patients when a resident helped a faculty member with treatment and documented the care.[2] [R. 63-4 at 6.] If Dr. Cunningham was a patient's Treating Provider, he received forty percent of the bill. [R. 63-4 at 4.]

---

[1] The parties dispute who changed the policy.

[2] The 2013 document reads, in full:

> If a patient is appointed to a particular Faculty member or Faculty Clinic, and a Faculty member provides care to the patient, billed charges will be recorded with the Treatment Provider listed as the provider number of the Faculty who provided care. These appointments may involve Residents in taking and documenting the patient's History & Physical Exam and in surgical follow-up evaluations; however, the Faculty member assigned to the patient will still be listed as the axiUm Treatment Provider.

Sometime in 2017, UK's billing employees began designating residents as the Treatment Provider whenever they documented a patient's care. [R. 63-4 at 6.] Dr. Cunningham claims to have noticed this change in some of his cases by the fall of 2017. [R. 1-2 at 16.] He alleges that the Dean of the College of Dentistry, Dr. Stephanos Kyrkanides, effectively changed UK's billing policy without following the mandatory procedures to do so. [R. 63-4 at 6–7.] Dr. Kyrkanides denies this version of events. [R. 143 at 6; R. 146 at 1.] Dr. Kyrkanides asserts that the UK Dental Care Board revised the policy in November of 2017. [R. 143 at 5.]

Regardless, everyone agrees that Dr. Cunningham changed his documentation practices around this time. [R. 63-4 at 9; R. 92 at 9.] From April of 2017 through July of 2018, UK designated a resident as the Treatment Provider for eighty-nine patients that Dr. Cunningham alleges he treated. [R. 63-4 at 37; R. 63-21.] Dr. Cunningham believed that he was entitled to income for these patients under UK's existing policies, even though a resident wrote the documentation for their treatment. [R. 63-4 at 9–10.] Accordingly, he reviewed the files and removed any reference to a resident from the notes for these patients. *Id.* at 10. Dr. Cunningham's colleague, Dr. Shehata, also engaged in this practice. Memorandum in Support of Motion for Summary Judgment at 11, *Shehata v. Blackwell*, No. 3:20-cv-00012-GFVT (E.D. Ky. June 26, 2021), ECF No. 71-4.

The altered records triggered an investigation within the University. [R. 71-4 at 10.] At the time, Dr. Blackwell served as UK's Provost. [R. 92 at 14.] UK Compliance officials interviewed seven residents whose notes Dr. Cunningham changed. [R. 62-9 at 292.] They all confirmed that treatment at the faculty clinic occurred in two ways. *Id.* Sometimes the residents

---

Notice of Filing, Attachment McConnell Deposition at 161, *Shehata v. Blackwell*, No. 3:20-cv-00012-GFVT (E.D. Ky. June 17, 2021), ECF No. 70-1. UK disputes both the applicability of this document to the patients at issue and whether it constitutes formal University policy. [*See* R. 63-4 at 5 ("As a purely advisory body, the UKDCB lacks authority to create or enforce rules, absent the Dean's approval.").]

3

would treat the patient and present their findings to Dr. Cunningham, who would then go in and reevaluate the patient. *Id.* Alternatively, the resident and Dr. Cunningham would treat the patient at the same time. *Id.* Regardless, none of the residents recalled an occasion when a patient left without seeing Dr. Cunningham. *Id.*

Based on the investigation, Stacey Moore, the compliance manager for the College of Dentistry, drafted an internal report in 2018. *See id.* at 291–92. Ms. Moore concluded that there was no patient care issue. *Id.* at 292. Instead, the issue was purely with the documentation. "[G]iven that the documentation in the record appears that [sic] . . . Dr. Cunningham saw the patient without a resident, the medical record does not reflect the services that were performed." *Id.* Ms. Moore believed that Dr. Cunningham deleted references to the residents "purely to obtain credit for these visits." *Id.*

After the investigation concluded, Dr. Blackwell decided that UK needed to discipline Dr. Cunningham. [R. 92 at 14.] Dr. Blackwell arranged a meeting with Dr. Cunningham in January of 2019 to inform him that the University would commence termination proceedings based on the compliance investigation. *Id.* Dr. Blackwell did not fire Dr. Cunningham right away. He decided to investigate the matter further and suspended Dr. Cunningham from clinic duty pending the outcome. *Id.* at 15. During this time, Dr. Cunningham engaged counsel to represent him in the event the University formally commenced termination proceedings. *Id.* at 16. UK's general counsel conversed with Dr. Cunningham's attorney as the University attempted to gather further information. *Id.*

When these talks broke down, Dr. Blackwell issued a Statement of Charges against Dr. Cunningham, which initiated the administrative process to terminate a tenured faculty member. *Id.* Like a civil complaint, that document detailed facts that the University alleged against Dr.

4

Cunningham.  [R. 62-18 at 193–217.]  The Statement alleges that "Dr. Cunningham stole from the University."  *Id.* at 193.  It claims that Dr. Cunningham "falsified medical records—including records used to bill Medicare and Medicaid—by claiming that he performed services when in fact the services were performed by a resident."  *Id.*  That decision "caused the College of Dentistry to submit false claims to the federal government . . . ."  *Id.* at 194.  Further, "Dr. Cunningham influenced a junior faculty member under his supervision," Dr. Shehata, "to list himself as treating provider for work performed by residents in the . . . clinic."  *Id.* at 195.  The Statement alleged that, once UK began to investigate, "Dr. Cunningham directed Dr. Shehata to be uncooperative."  *Id.*

Shortly thereafter, Dr. Cunningham resigned.  [R. 63-4 at 21.]  Dr. Cunningham sued the University and several officials on multiple grounds, including a defamation claim against Dr. Blackwell.  [R. 1-2.]  Dr. Blackwell moved for summary judgment on the defamation claim, invoking a defense referred to as qualified privilege.  [R. 92 at 44.]  The Court initially denied his motion, holding that a genuine issue of material fact existed as to whether Dr. Blackwell's allegations were true.  [R. 118 at 35.]  Because that decision ran afoul of Kentucky law, the Court granted a motion from Dr. Blackwell asking the Court to reconsider and permitted the parties to submit supplemental briefing.  [R. 164.]  Now, the matter of whether summary judgment should properly issue on the defamation claim is ripe for review.  [R. 165; R. 168.]

## II

Federal courts grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  However, some factual disputes between the parties do not prevent summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).  Only facts that affect

5

the outcome of the suit under the governing law preclude the entry of summary judgment. *Id.* at 249. The facts must also be genuine in that, if proven at trial, a reasonable jury could rely on them to return a verdict for the non-moving party. *Id.* at 249.

To be disputed, a party need not prove a material fact conclusively, but the non-moving party must present sufficient probative evidence to require a judge or jury to resolve the matter at trial. *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968). A court construes the evidence in the light most favorable to the non-moving party. *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425, 427 (6th Cir. 1962).

Under Kentucky law, the elements of a defamation claim are:

> (a) a false and defamatory statement concerning another; (b) an unprivileged publication to a third party; (c) fault amounting at least to negligence on the part of the publisher; and (d) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication.

*Toler v. Süd-Chemie, Inc.*, 458 S.W.3d 276, 282 (Ky. 2014) (quoting Restatement (Second) of Torts § 558 (1977)). Generally, a statement is actionable per se if it involves false allegations of unfitness to perform a job. *Id.* An exception to this per se rule exists if the societal interest in the unrestricted flow of information is greater than the private interest in redressing reputational harm. *Id.*

This qualified privilege protects the speaker "where the communication is one in which the party has an interest and it is made to another having a corresponding interest." *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 793 (Ky. 2004). In the employment context, it applies to internal discussions and communications that are necessary to a company's proper function and the enforcement of the law. *Dossett v. N.Y. Mining & Mfg. Co.*, 451 S.W.2d 843, 846 (Ky. 1970). There, the public interest in detecting wrongdoing outweighs the private interest in an action for

6

defamation if the suspicions are alleged in good faith. *See id.* Accordingly, the privilege "will provide protection despite a statement's falsity . . . ." *Toler*, 458 S.W.3d at 284.

To protect this socially valuable speech, Kentucky law places the burden on the plaintiff to defeat an assertion of qualified privilege. *Id.* The party bearing the privilege cannot abuse it. *Id.* at 283. A plaintiff can overcome the privilege by showing "both actual malice and falsity . . . ." *Id.* Kentucky law takes this requirement seriously; a plaintiff cannot defeat a motion for summary judgment by merely alleging that a statement is false. *See id.* at 286 (applying this rule to a motion for directed verdict); *see also Harstad v. Whiteman*, 338 S.W.3d 804, 813 (Ky. Ct. App. 2011) (applying to summary judgment). "[T]he mere allegation of falsity" does not "permit an inference of malice." *Toler*, 458 S.W.3d at 287.

A showing of actual malice depends "not so much [on] *what* was said as . . . *how* it was said." *Id.* at 284. So, a plaintiff can defeat the privilege by showing "the publisher's knowledge or reckless disregard as to the falsity of the defamatory matter." *Id.* (quoting Restatement (Second) of Torts § 596 cmt. a (1977)). The plaintiff must adduce some evidence that the speaker's "perception was not simply the product of mistaken observation . . . ." *Harstad*, 338 S.W.3d at 813. To demonstrate a reckless disregard of falsity, the plaintiff must show a high degree of awareness of probable falsity such that the publisher entertained serious doubts as to the truth of his statement. *See Ball v. E.W. Scripps Co.*, 801 S.W.2d 684, 689 (Ky. 1990) (citing *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964) and *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)) (reckless disregard in the context of the First Amendment); *see also Harstad*, 338 S.W.3d at 813 (applying this standard to the qualified privilege). This showing is particularly relevant because trial courts must consider the applicable evidentiary burden when deciding whether sufficient evidence exists to submit a claim to the jury. *Liberty Lobby*, 447 U.S. at 254.

7

In the Statement of Charges, Dr. Blackwell levied four allegations that Dr. Cunningham believes are defamatory. Dr. Blackwell claimed (A) that Dr. Cunningham stole from the University, (B) that Dr. Cunningham took credit for patient care services "when in fact the services were performed by a resident," (C) that Dr. Cunningham caused the College of Dentistry to submit false claims to the federal government, and (D) that Dr. Cunningham encouraged Dr. Shehata to do the same and to not cooperate with the University's investigation. [R. 165 at 2–3.]

A

Dr. Cunningham has adduced sufficient evidence for a jury to decide whether he can defeat the qualified privilege as to the allegation that he stole from UK. First, construing the evidence in the light most favorable to Dr. Cunningham, a jury could conclude that this statement is false. The guidance document approved by the UK Dental Care Board in 2013 could establish that UK owed Dr. Cunningham the money at issue. [*See* R. 61-18 at 221.] Under its rules, whenever "a patient is appointed to a particular Faculty member or Faculty Clinic, and a Faculty member provides care to the patient," the Faculty member must be designated as the "Treatment Provider" even if the resident performs some of the care.[3] *Id.*

During UK's 2018 investigation, all the residents verified that Dr. Cunningham worked with them at some point during every patient's care. [R. 62-9 at 292.] Dr. Cunningham also submitted deposition testimony from four UK dentists who concluded that Dr. Cunningham treated the patients and that he should have been designated as the Treatment Provider under the applicable policy. [R. 165 at 8.] Because the DSP policy required Dr. Cunningham to receive

---

[3] Dr. Blackwell's Statement of Charges quotes a different portion of the 2013 policy. [R. 165 at 8; R. 62-18 at 199.] That rule applied to patients "appointed for a particular Resident or Resident Clinic . . . ." [R. 62-18 at 221.] As Dr. Blackwell's Statement of Charges acknowledges, the clinic at issue was a Faculty Clinic. *Id.* at 199. While the Statement of Charges discusses some momentum within the University to apply the Resident Clinic rule to Faculty Clinics, Dr. Cunningham disputes whether the policy was ever validly amended. *Id.* at 199–200; [R. 165 at 8.]

8

the forty percent fee if he was designated as the Treatment Provider, a reasonable jury could conclude that Dr. Cunningham earned the money at issue and, therefore, he did not steal it.

Second, Dr. Cunningham has adduced evidence that Dr. Blackwell recklessly disregarded the possibility that this statement was false. Dr. Blackwell's decision to terminate Dr. Cunningham began with the 2018 compliance investigation. [*See* R. 92 at 14.] That investigation produced no evidence that Dr. Cunningham did not participate in the treatment for the patients. [*See* R. 62-9 at 291–92.] Instead, the only indication from the report was that Dr. Cunningham treated each patient at issue in conjunction with a resident. *Id.* at 292. If a jury determined that UK's policy at the time was consistent with the 2013 guidance document, this would mean that from the beginning of his involvement in Dr. Cunningham's termination, Dr. Blackwell had information that indicated that Dr. Cunningham was entitled to the funds. Dr. Blackwell points to nothing in his possession that would have indicated otherwise. [*See* R. 168 at 13–17.]

Instead, he makes three attempts to muddy the issue. First, Dr. Blackwell asserts that he continued to investigate the matter after receiving the 2018 report. *Id.* at 14. After acknowledging that the report was "skimpy," Dr. Blackwell "kept digging" to obtain reliable information on the billing issue.[4] *Id.* But Dr. Blackwell does not indicate what, if anything, he dug up. Dr. Blackwell points to nothing that suggests Dr. Cunningham did not participate in the treatment of the patients at issue.

---

[4] The quote that Dr. Blackwell "kept digging" comes from the Sixth Circuit's opinion on Dr. Cunningham's First Amendment retaliation claim. *Cunningham v. Blackwell*, 41 F.4th 530, 542 (6th Cir. 2022). Dr. Blackwell believes that the Sixth Circuit's decision should bind this Court on the defamation claim. [*See* R. 168 at 14–15.] Context matters. The Sixth Circuit stated that Dr. Blackwell "in fact kept digging" to show that the connection between Dr. Cunningham's potentially protected speech and UK's punishment was attenuated. *See Cunningham*, 41 F.4th at 542. The panel found that Dr. Blackwell did not rely upon the "skimpy" 2018 report in a vacuum. *Id.* It did not state, nor does Dr. Blackwell show, what other information Dr. Blackwell obtained and relied upon in issuing the statement of charges.

9

Second, Dr. Blackwell points to the Court's conclusion, in a related context, that there is a genuine issue of material fact as to whether Dr. Cunningham earned this income. *Id.* at 15. While considering a motion for summary judgment as to Dr. Cunningham's state wage and hour claim, the Court concluded that "it remains unclear whether Dr. Cunningham 'treated' each patient in the instances he cites or whether a third party was properly permitted to determine who 'treated' patients." [R. 118 at 114.] From this, Dr. Blackwell argues "[g]iven that this Court found there is a *genuine dispute* of fact regarding whether Dr. Cunningham was entitled to the money for those visits, Dr. Blackwell cannot have known the allegation was false or acted with reckless disregard." [R. 168 at 15.] Dr. Blackwell argues that the Court's conclusion regarding the evidence submitted thus far in the case is proof that Dr. Cunningham cannot meet his high evidentiary burden to overcome the qualified privilege. *Id.* at 16.

This argument misapprehends both the Court's function during summary judgment and the Court's prior ruling. A decision to deny summary judgment because there is a genuine dispute of fact is not a comment on the merits of the case. *Switzerland Cheese Ass'n v. E. Horne's Market, Inc.*, 385 U.S. 23, 25 (1966). Instead, if the non-moving party adduces evidence that a reasonable jury could use to rule in their favor, the Court's inquiry concludes. *Liberty Lobby*, 477 U.S. at 257. When the Court concluded that there is a dispute of fact as to whether Dr. Cunningham "treated" the patients as defined by the existing University policy, it made no comment on the question of whether Dr. Cunningham earned the income at issue. [*See* R. 118 at 114.] It simply decided that Dr. Cunningham produced sufficient evidence for a jury to decide whether he earned the income. Dr. Blackwell cannot use the Court's context specific remarks to demonstrate that, years ago, he believed there was a dispute as to whether Dr. Cunningham was entitled to the income. Through the 2018 report and the 2013 policy, Dr. Cunningham has

10

presented evidence that a jury could use to conclude that Dr. Blackwell had a high degree of awareness that Dr. Cunningham earned the income.

  Finally, Dr. Blackwell argues that, if Dr. Cunningham believed UK deprived him of income he earned, the proper course of action was to pursue an administrative remedy rather than to alter patient records to surreptitiously obtain the money. [R. 168 at 16.] That may be true. But it does nothing to dispute Dr. Cunningham's entitlement to the funds. Dr. Blackwell suggests that, even if Dr. Cunningham was entitled to the funds, he still stole money by tricking UK into paying him. *See id.* Dr. Blackwell analogizes the situation to a cashier who, believing that his paycheck shorted him four hours, reaches into the till and pays himself rather than filing a grievance with his employer. *See id.*

  If the Court accepted this argument, it would usurp the role of the jury. The Court's job is to decide "whether a statement is or could be defamatory perse; the jury decides whether it was taken as such." *Desai v. Charter Commc'ns., LLC*, 381 F. Supp. 3d 774, 787 (W.D. Ky. 2019). The jury in this case must decide whether the audience of the Statement of Charges understood Dr. Blackwell to mean stealing in the sense that Dr. Cunningham tricked UK into paying him money. *See id.* The Court merely concludes that a jury could interpret the statement to mean that Dr. Cunningham took money to which he had no right. *See id.* Dr. Blackwell's Statement of Charges did not claim that Dr. Cunningham tricked UK into paying him money that he may or may not have deserved. The Statement outright alleges that Dr. Cunningham had no right to it in the first place. [*See* R. 62-18 at 212 ("Dr. Cunningham's receipt of DSP in connection with these bills was contrary to the established policy of the College.").]

11

**B**

That said, Dr. Cunningham cannot overcome the qualified privilege as to Dr. Blackwell's charge that Dr. Cunningham took credit for services performed by the residents. Dr. Cunningham's theory is that he and the residents collaborated to treat the patients. But there is no dispute that he changed the documentation to indicate that he treated the patients alone. For each of the patients at issue, Dr. Cunningham altered the records in a way that took credit for something a resident did. Dr. Cunningham cannot pierce the qualified privilege as to this statement because he cannot show it was false.

Dr. Cunningham relies on the 2018 report. [R. 165 at 4.] To reiterate, the report relates that Dr. Cunningham either treated the patients alongside the residents or allowed the residents to take the first shot at the care and then doublechecked their work. [R. 62-9 at 292.] Dr. Cunningham's theory appears to be that, if he either repeated a resident's work or performed it alongside the resident, he performed every act for which he took credit. [*See* R. 165 at 4.]

That argument ignores the importance of acknowledging the work performed by the residents, even if it was redundant to Dr. Cunningham's own efforts. The Statement of Charges explains that, for collaborations between faculty and residents:

> There must be separate notes entered by the resident and the faculty member. . . . The combination of notes must make it clear that the faculty member was present for the "key portions" of the evaluation performed by the resident or that the faculty member repeated the key elements of the exam and discussed them with the resident. If this is not done, a bill cannot be sent for the services in question.

[R. 62-18 at 201–02.] This requirement tracks a rule promulgated by the Centers for Medicare and Medicaid Services for teaching physicians. [R. 168 at 4–6.] The rule accounts for various scenarios where a resident and a faculty member collaborate while always emphasizing the need

12

to distinguish between the faculty member's and the resident's work, even if it is redundant. *See id.*

Even if Dr. Cunningham did the same work as the residents, an accurate note needed to delineate the actions of both Dr. Cunningham and the resident. There is no dispute that the notes only attribute the care to Dr. Cunningham. Accordingly, Dr. Cunningham has not provided evidence that Dr. Blackwell knew or should have known that this statement was false.

C

For similar reasons, Dr. Cunningham fails to show that Dr. Blackwell knew or should have known that the allegation that Dr. Cunningham caused the College of Dentistry to submit false claims to the federal government was false. Dr. Cunningham's arguments to the contrary focus on statements made by the United States Attorney's office and UK's general counsel, William Thro. Neither is genuine evidence that Dr. Blackwell spoke maliciously. *See Liberty Lobby*, 477 U.S. at 249 (evidence must be genuine in that, if proven at trial, a reasonable jury could rely on them to return a verdict for the non-moving party).

The United States Attorney's statement has no probative value. Mr. Thro contacted U.S. Attorney Robert Duncan to see whether the Government was interested in investigating Dr. Cunningham's actions. [R. 165 at 5.] Mr. Thro recalls the United States Attorney's office declining because "the amount at issue was not significant" and "the victim . . . was the University itself rather than the federal Medicaid program." *Id.* Dr. Cunningham interprets this as a conclusion by the United States Attorney that no violation occurred. *Id.* at 6. But the United States Attorney made no such conclusion. A decision not to bring charges is not the same as an exoneration. The United States Attorney's office could have believed that Dr. Cunningham caused UK to submit false claims but exercised its discretion to not prosecute.

13

Mr. Thro's statement also shows nothing about Dr. Blackwell's awareness that the allegation was false. Mr. Thro claims that he told the United States Attorney that "there was no dispute that the services billed had been rendered. And that the government paid the appropriate amount to us." [R. 165 at 5.] Even if Dr. Blackwell knew about Mr. Thro's statements, the statements do not disprove Dr. Blackwell's false claims theory. Dr. Blackwell's concern regarding false claims did not depend on whether someone actually treated the patients or whether UK billed the correct amount. Instead, Dr. Blackwell was concerned with who performed the services. There is no dispute that Dr. Cunningham deleted documentation of some care performed by residents. Dr. Cunningham fails to show that Dr. Blackwell had a high degree of awareness that he was incorrect to allege that Dr. Cunningham caused UK to submit false claims.

## D

Finally, Dr. Cunningham cannot show that Dr. Blackwell spoke maliciously when he charged Dr. Cunningham with encouraging Dr. Shehata to alter patient records and to refuse to cooperate with the University's investigation. Dr. Cunningham alleges that Dr. Blackwell's basis for this charge came from a January 2019 meeting with Dr. Sheehata. [R 165 at 11.] Dr. Cunningham argues that Dr. Blackwell could not rely on what he learned from that meeting.

To do so, Dr. Cunningham challenges Dr. Blackwell's memory of the meeting. Dr. Cunningham points to deposition testimony in which Dr. Blackwell admitted that "I didn't recall the exact words, but my interpretation was – was that [Dr. Shehata] was influenced by Dr. Cunningham." *Id.* (quoting [R. 62-2 at 54 (in response to the question "Is it your testimony that Dr. Shehata told you during that meeting that Dr. Cunningham instructed him not to cooperate with Corporate Compliance?")]). Dr. Cunningham bears the burden of adducing evidence that

14

Dr. Blackwell's "perception was not simply the product of mistaken observation . . . ." *Harstad*, 338 S.W.3d at 813. Viewed in the light most favorable to Dr. Cunningham, this testimony at best could show a misinterpretation of Dr. Shehata's remarks. Dr. Blackwell's inability to recall the specifics of his meeting with Dr. Shehata is not sufficient to demonstrate malice.[5]

### III

A district court can "consider summary judgment on its own after identifying for the parties the material facts that may not be genuinely in dispute." Fed. R. Civ. P. 56(f)(3). Of the four allegedly defamatory statements, Dr. Cunningham has only adduced evidence that could show that Dr. Blackwell spoke maliciously when he charged Dr. Cunningham with stealing from the University. Dr. Blackwell based this claim on the assertion that UK did not owe Dr. Cunningham money for the patients at issue under applicable University policy. But Dr. Cunningham has shown facts from which a jury could conclude that the applicable policy required Dr. Cunningham to be paid for treating patients together with a resident. He has also provided evidence that the only information Dr. Blackwell possessed indicated that Dr. Cunningham treated all the patients at issue along with a resident. A reasonable jury could conclude that Dr. Blackwell had a high degree of awareness of the probable falsity of the accusation. Accordingly, for these reasons and the Court being otherwise sufficiently advised, it is hereby **ORDERED** as follows:

---

[5] Dr. Cunningham makes a second, spurious argument that Dr. Blackwell could not rely on his memory of Dr. Shehata's statements. "Dr. Blackwell failed to follow up and confirm that he correctly understood Dr. Shehata, who is Egyptian and speaks with an accent, before lodging these charges against Dr. Cunningham." [R. 165 at 11.] This argument would at best show a mistaken observation and is insufficient to demonstrate malice. *Harstad*, 338 S.W.3d at 813.

1. Pursuant to Federal Rule of Civil Procedure 56(f)(3), summary judgment is **GRANTED** in favor of Defendant David W. Blackwell against Plaintiff Larry Cunningham's defamation claim for the following statements:

    a. That Dr. Cunningham took credit for patient care services when in fact the services were performed by a resident;

    b. That Dr. Cunningham caused the College of Dentistry to submit false claims to the federal government; and

    c. That Dr. Cunningham encouraged Dr. Shehata to do the same and to not cooperate with the University's investigation.

2. Summary judgment is **DENIED** as to Plaintiff Larry Cunningham's defamation claim regarding Defendant David W. Blackwell's statement that Dr. Cunningham stole from the University.

This the 11th day of July 2023.

Gregory F. Van Tatenhove
United States District Judge